IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No. 12-cv-00393-PAB-KLM

TIMOTHY L. BLIXSETH, an individual,

      Plaintiff,

v.

CUSHMAN & WAKEFIELD OF COLORADO, INC., a Colorado corporation,
DEAN PAUWW, an individual and citizen of the State of Colorado,
CUSHMAN & WAKEFIELD, INC., a New York corporation,
CREDIT SUISSE AG, a Swiss corporation,
CREDIT SUISSE GROUP AG, a Swiss corporation,
CREDIT SUISSE SECURITIES (USA), LLC, a Delaware limited liability company,
CREDIT SUISSE (USA), INC., a Delaware corporation,
CREDIT SUISSE HOLDINGS (USA), INC., a Delaware corporation,
CREDIT SUISSE CAYMAN ISLAND BRANCH, an entity of unknown type, and
DOES 1-100,

      Defendants.

---

## ORDER

---

    This matter is before the Court on the Motion to Dismiss [Docket No. 24] filed by

defendants Cushman & Wakefield, Inc., Cushman & Wakefield of Colorado, Inc.,

(collectively "Cushman") and Dean Pauww, as well as the Motion to Dismiss [Docket

No. 28] filed by defendants Credit Suisse AG, Credit Suisse Securities (USA), LLC,

Credit Suisse (USA) Inc., Credit Suisse Holdings (USA) Inc., and Credit Suisse Cayman

Islands Branch.[1]  The Court has subject matter jurisdiction pursuant to 28 U.S.C.

§§ 1331, 1332.

---

[1]The Court will use the term "Credit Suisse" to denote actions taken by all the Credit Suisse entities.  The Court will refer to the individual entity names identified in the complaint to denote actions performed by those entities.

## I.  BACKGROUND[2]

### A.  Allegations in Complaint

This case arises out of a Credit Agreement between the Yellowstone Mountain Club, LLC ("Yellowstone Club"), Yellowstone Development, LLC, Big Sky Ridge, LLC, and Credit Suisse Cayman Islands Branch.  *See* Docket Nos. 28-1, 28-2.  Before August 13, 2008, plaintiff Timothy L. Blixseth was the sole shareholder and president of Blixseth Group, Inc. ("BGI"), which is an Oregon S Corporation.[3]  Docket No. 1 at 35, ¶ 87.  During the relevant period, BGI owned approximately 89% of the Yellowstone Club – a master-planned private ski and golf resort community established by plaintiff and his ex-wife, Edra Blixseth.  *Id*. at ¶¶ 88, 90; *see also id*. at 8, ¶ 24.  BGI and plaintiff, as president of BGI, managed and made all strategic, business, planning, and financial decisions for the Yellowstone Club.  *Id*. at ¶ 89.

In 2003 and 2004, Credit Suisse First Boston devised a financing program aimed at high-end luxury resorts, which would allow the developers and owners of such resorts to take equity out of these projects in the form of loans or distributions to shareholders and limited liability members.  Docket No. 1 at 7, ¶ 5, ¶ 19.  Credit Suisse First Boston's program was named the "Equity Recapitalization Loan Program,"

---

[2]The following facts are drawn from plaintiff's complaint and, for the purposes of ruling on the motions to dismiss, assumed to be true.

[3]An S corporation is a corporate entity that is not taxed at the corporate level. The responsibility for the payment of taxes owed by the S corporation "passes through" to its shareholders, who pay the tax liability in proportion to each shareholder's pro rata share of the S corporation.  An S corporation avoids double taxation on dividends because S-corporation income is only taxed once – at the shareholder level.  *See In re Northlake Foods, Inc.*, 715 F.3d 1251, 1254 n. 2 (11th Cir. 2013).

designed to make plaintiff and other resort owners believe that the loan proceeds derived from the equity in the resorts were based on traditional real estate appraisal valuations. *Id*. The loans, however, were not based on real estate valuations of equity but on undiscounted, projected, future cash flows, not taking into consideration market risks – which plaintiff claims was in violation of federal and state law and regulations. *Id*.

The basic goal and intent of the equity recapitalization loan program was to induce the high-end resort developers into believing that the loans were being collateralized by "equity" based real estate "appraisals" in conformity with "traditional" banking industry standards and to borrow hundreds of millions of dollars in loans based on traditional appraisals. Docket No. 1 at 5-6, ¶ 20. Credit Suisse First Boston engendered confidence and trust as the lender advisor and fiduciary of the developers based on its aggressive marketing scheme in which it departed from traditional lending and banking relationships and used misleading language such as the equity recapitalization loan program in order to "bait" the developers into a confidence and trust based relationship, and then "switch" them into a loan scheme in violation of state and federal law. *Id*. Credit Suisse demanded that the lawyers for the developers endorse the legality of the scheme with categorical language that it "complied with all laws" in written "Opinion Letters," while knowing that it violated fundamental real estate lending and securities laws, and violated fundamental principles of tort and contract. *Id*.

On December 16, 2004, Jeff Barcy, a senior executive at Credit Suisse First Boston, personally solicited plaintiff in an attempt to convince plaintiff to process all of the Yellowstone Club's financial needs through Credit Suisse. Docket No. 1 at 37, ¶ 94.

3

As part of this solicitation effort, Mr. Barcy referred plaintiff to Ron Boedekker, the real estate developer for Lake Las Vegas, another master-planned private resort community.  *Id.* at 37-38, ¶ 97.  Credit Suisse had financed a loan for Mr. Boedekker and Lake Las Vegas, which was supported by an appraisal performed by Charles Reinagel, an appraiser for Cushman, who utilized the Total Net Value method to reach a valuation estimate.  *Id.* at 27, ¶ 66.

Sometime after plaintiff's introduction to Mr. Boedekker, plaintiff agreed to a loan on behalf of the Yellowstone Club in the amount of $150 million financed by Credit Suisse First Boston.  Docket No. 1 at 38, ¶ 98.  Plaintiff also signed a Credit Agreement, in his capacity as the president of BGI and manager of the Yellowstone Club, with Credit Suisse Cayman Islands Branch to secure a second loan in the amount of $375 million on behalf of the Yellowstone Club.  *See* Docket Nos. 28-1, 28-2.[4]  The Yellowstone Club was eligible to receive a $375 million loan based on a July 1, 2005 appraisal performed by Dean R. Pauww, a certified appraiser employed by Cushman, who valued the Yellowstone Club at $1.165 billion.  *See* Docket No. 25-1 at 6-7.  Mr. Pauww reached his valuation opinion of the Yellowstone Club by using the Total Value Net method, which estimates the value of master-planned real estate communities based on "the sum of the market value of the bulk lots of the entire planned community,

---

[4]Defendants have attached documents to their motions to dismiss and request that the Court consider these documents.  *See* Docket Nos. 25-26; Docket Nos. 28-1 to 28-17.  Plaintiff does not object to defendants' attachment of these documents in his responses.  *See* Docket Nos. 34, 35.  Accordingly, the Court will consider these documents to the extent they are central to plaintiff's complaint, incorporated by reference in the complaint, or matters of which the Court may take judicial notice.  *See* *Gee v. Pacheco*, 627 F.3d 1178, 1186 (10th Cir. 2010).

as if all of the bulk lots were complete . . . and available for sale to merchant builders, as of the date of the appraisal." *Id*. at 11; *see also id.* at 70-71 (describing the valuation methodology).  The Total Net Value method used in Pauww's appraisal was a new appraisal methodology in 2004.  Docket No. 1 at 27, ¶ 66.  Mr. Pauww's appraisal opinion noted that the $1.165 billion valuation was "not the Market Value of the [Yellowstone Club] as the standard valuation deductions for the time value of money and profit are not reflected . . . [and that] [t]he As Is market value would be lower than the Total Net Value."  Docket No. 25-1 at 88.  In addition, Mr. Pauww's appraisal noted that, because it did not use an "as is" market value to estimate the value of the Yellowstone Club, the appraisal did not comply with the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), Pub. L. No. 101-73, 103 Stat. 183.[5]  *See* Docket No. 25-1 at 3-4.

Several individuals working for Cushman, including Mr. Pauww, had reservations about the use of the Total Net Value method, *id*. at 27-30, ¶¶ 69-75, yet neither Cushman nor any of its certified appraisers advised plaintiff or other real estate developers about the potential problems associated with the Total Net Value method. *Id*. at 33-34, ¶¶ 84-85.  The July 1, 2005 $1.165 billion valuation of the Yellowstone Club misrepresented the true value of the Yellowstone Club, which Cushman knew or should have known because Cushman previously valued the Yellowstone Club at $420 million in October 2004.  *Id*. at 38-39, ¶ 99.  Plaintiff would not have accepted Credit

---

[5]Congress enacted FIRREA to "provide that Federal financial and public policy interests in real estate related transactions will be protected by requiring that real estate appraisals utilized in connection with federally related transactions are performed in writing, in accordance with uniform standards."  12 U.S.C. § 3331.

Suisse's loan, but for the appraisal opinion offered in support of the $1.165 million valuation. *Id*. at 39-40, ¶¶ 100-101.

The Credit Agreement plaintiff signed as president of BGI contains a non-recourse clause, which states that none of the partners, managers, or managing members of the Yellowstone Club may be held personally liable for payment of the obligations arising out of the Credit Agreement.[6]  Docket No. 28-2 at 47.  Plaintiff used $209 million from the $375 million loan for purposes unrelated to the Yellowstone Club because he relied on representations made by employees of Credit Suisse First Boston that he could do so under the terms of the Credit Agreement.  Docket No. 1 at 14, ¶ 37; *id*. at 23, ¶ 55; *id*. at 38-40, ¶¶ 99-101.

During the negotiations for the Credit Agreement, Credit Suisse admitted in a "Memo to the Credit Committee" that it was acting as "Yellowstone Club's lending advisor."  Docket No. 1 at 42, ¶¶ 105, 106.  Credit Suisse's risk management team drafted a confidential information memorandum ("CIM") confirming the fiduciary relationship between the Yellowstone Club and Credit Suisse.  *Id*. at 43-45, ¶¶ 109-111.

In December 2006, plaintiff and Edra Blixseth filed for divorce.  Docket No. 1 at 36, ¶ 92.  In March 2007, plaintiff told Edra Blixseth that he intended to sell the

---

[6]Section 9.20 of the Credit Agreement states:

> **No Recourse to Partners**.  Notwithstanding anything in any of the Loan Documents to the contrary, no partner or member or managing member in the Borrower shall be personally liable for the payment of the Obligations; provided, however, nothing contained herein shall release, diminish or impair the obligations of the Borrower to pay in full when due all Obligations in accordance with the provisions of the Loan Documents.

Docket No. 28-2 at 47, § 9.20.

Porcupine Creek, a major BGI asset, in order to repay the $209 million he spent from the $375 million loan to the Yellowstone Club. *Id*. at 47, ¶ 116. Edra Blixseth refused to cooperate and instead embarked on a course that eventually led to the transfer of BGI's primary assets to Samuel Byrne, principal of CrossHarbor Capital Partners, LLC ("CrossHarbor"). *Id*. at 48, ¶ 118.

On January 15, 2008, CrossHarbor made an offer to purchase the Yellowstone Club for $455 million. Docket No. 1 at 48, ¶ 119(a). CrossHarbor sought to purchase the Yellowstone Club as part of a "pre-packaged bankruptcy" to shed some of the Yellowstone Club's liabilities, which offer plaintiff refused. *Id*. at 49, ¶ 119(d). On March 26, 2008, CrossHarbor cancelled the $455 million proposed purchase of the Yellowstone Club because of plaintiff's refusal, and CrossHarbor began negotiations with Edra Blixseth in an attempt to obtain her ownership interests in the Yellowstone Club. *Id*. at 48, ¶ 119(b). In April 2008, CrossHarbor purchased a portion of the $375 million debt the Yellowstone Club owed to Credit Suisse. *Id*. at 119(c). Throughout 2008, CrossHarbor and Edra Blixseth developed a plan wherein Edra Blixseth would obtain ownership of the Yellowstone Club through the divorce proceedings and CrossHarbor would inject $100 million of operating capital into the Yellowstone Club. *Id*. at 50, ¶¶ 119(f)-(h). Sometime before August 13, 2008, CrossHarbor gave Edra Blixseth a $35 million loan to purchase the Yellowstone Club as part of her divorce settlement. *Id*. at 50-51, ¶¶ 119(h).

On August 13, 2008, Edra Blixseth and plaintiff entered into a Marital Settlement Agreement ("MSA"). *Id*. at 37, ¶ 93. Pursuant to the MSA, Edra Blixseth received the

Yellowstone Club, Porcupine Creek, and other marital property valued at over $800 million. *Id*. at 50-51, ¶ 119(h).  Shortly thereafter, Edra Blixseth transferred control of the Yellowstone Club to CrossHarbor and CrossHarbor intentionally defaulted on several of the Yellowstone Club's debts in order to qualify for bankruptcy. *Id*. at 52-53, ¶¶ 119(k)-(l).  On November 10, 2008, CrossHarbor filed a Chapter 11 bankruptcy petition on behalf of the Yellowstone Club. *Id*. at 51-52, ¶¶ 119(h)-(i).  CrossHarbor acted as the debtor in possession for the Yellowstone Club's bankruptcy proceedings and agreed to a "scheme[ ]" with Credit Suisse to gain control of the Yellowstone Club and blame plaintiff for the financial demise of the Yellowstone Club. *Id*. at 53-54, ¶¶ 119(m)-(n).

During the bankruptcy proceedings, CrossHarbor and Credit Suisse proposed a Plan of Reorganization which gave CrossHarbor complete control of the Yellowstone Club's assets and allowed Credit Suisse to have a remaining balance of $375 million on its loan to the Yellowstone Club. *Id*. at 54, ¶ 119(o).  In addition, Credit Suisse and CrossHarbor agreed to collect the balance of the $375 million loan from plaintiff's individual assets through a Liquidating Trust for the Yellowstone Club's bankruptcy. *Id*. at 54, ¶ 119(p).

Credit Suisse First Boston agreed to participate in the Third Amended Plan of Reorganization with other Yellowstone Club creditors, CrossHarbor, and the Liquidating Trustee.  Docket No. 1 at 41, ¶ 103.  Pursuant to the terms of the Third Amended Plan of Reorganization, the Liquidating Trustee was authorized to file claims against plaintiff to recover $286 million in loan proceeds, despite the non-recourse clause of the Credit

8

Agreement.  *Id*. at 41, ¶ 104; *id*. at 54-55, ¶ 119(q).  The Third Amended Plan of

Reorganization also contained an exculpation clause indemnifying all parties to the

reorganization agreement from any liability to any third party for claims arising out of or

related to the Yellowstone Club's Chapter 11 bankruptcy.  Docket No. 28-12 at 48,

§ 8.4.

Had plaintiff known the Credit Agreement did not comply with FIRREA and the

Uniform Standards of Professional Appraisal Practice ("USPAP"), he would not have

accepted the $375 million loan from Credit Suisse or relinquished his ownership of the

Yellowstone Club to Edra Blixseth as part of the MSA.  Docket No. 1 at 56-57, ¶¶ 120-

121.  As a result of the equity recapitalization loan program, plaintiff suffered damages

in excess of $1.068 billion comprised of attorneys' fees, lost business opportunities, and

reputational harm.  *Id*. at 57, ¶ 124.

### B.  Procedural History

On February 14, 2012, plaintiff filed the present case, asserting claims against all

defendants for (1) violations of the Racketeer Influenced and Corrupt Organizations Act

("RICO"), 18 U.S.C. §§ 1961-1968; (2) common law fraud; (3) breach of fiduciary duty;

(4) common law negligence and negligent misrepresentation; (5) tortious interference

with contractual relations; (6) breach of covenants of good faith and fair dealing under

the Uniform Commercial Code and common law; (7) breach of contract; (8) equitable

indemnity; and (9) common law conspiracy.  Docket No. 1 at 68-83.

On May 15, 2012, defendants filed the present motions to dismiss all of plaintiff's

claims.  Docket No. 24; Docket No. 28.  In his response to Cushman's motion to

dismiss, plaintiff indicated that he is no longer pursuing his claims for tortious

interference of contract, breach of contract, and equitable indemnity against Cushman. *See* Docket No. 34 at 34. Similarly, in his response to Credit Suisse's motion to dismiss, plaintiff states that he no longer seeks to prosecute his equitable indemnity claim against Credit Suisse. Docket No. 35 at 35.

## II. STANDARD OF REVIEW

Credit Suisse requests that the Court dismiss plaintiff's complaint pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.[7] Docket No. 28 at 34. Dismissal pursuant to Federal Rule of Civil Procedure 12(b)(1) is appropriate if the Court lacks subject matter jurisdiction over claims for relief asserted in the complaint. Rule 12(b)(1) challenges are generally presented in one of two forms: "[t]he moving party may (1) facially attack the complaint's allegations as to the existence of subject matter jurisdiction, or (2) go beyond allegations contained in the complaint by presenting evidence to challenge the factual basis upon which subject matter jurisdiction rests." *Merrill Lynch Bus. Fin. Servs., Inc. v. Nudell*, 363 F.3d 1072, 1074 (10th Cir. 2004) (quoting *Maestas v. Lujan*, 351 F .3d 1001, 1013 (10th Cir. 2003)). When resolving a facial attack on the allegations of subject matter jurisdiction, the Court "must accept the allegations in the complaint as true." *Holt v. United States*, 46 F.3d 1000, 1002 (10th Cir. 1995).

To survive a motion to dismiss pursuant to Rule 12(b)(6), the complaint need not allege specific facts, but need only give defendants fair notice of what the claim is and the grounds upon which it rests. *Erickson v. Pardus*, 551 U.S. 89, 93 (2007). However,

---

[7]Cushman requests dismissal pursuant to Fed. R. Civ. P. 12, but does not specify a particular subsection. Docket No. 24 at 1.

"where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not shown – that the pleader is entitled to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (internal quotation marks and alteration marks omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. at 678.

## III.  ANALYSIS

### A.  RICO

Cushman and Credit Suisse argue that Blixseth does not have standing to assert his RICO claim because he does not allege facts showing that he suffered any harm independent from the harm suffered by the Yellowstone Club.[8]  Docket No. 24 at 8-9; Docket No. 24 at 4-8.  In response, plaintiff argues that his RICO claim adequately asserts injuries that he personally suffered independent of any damage suffered by the Yellowstone Cub and independent of his former status as a shareholder.  Docket No. 35 at 3-4.

Pursuant to RICO, a plaintiff can recover damages for injuries to his business or property arising out of prohibited racketeering activities.  18 U.S.C. § 1964(c); *see Bixler v. Foster*, 596 F.3d 751, 756 (10th Cir. 2010).  Generally, a shareholder or guarantor lacks standing to assert RICO claims when his or her losses are only derivative of a corporation's losses, meaning that the individual's losses come about only because of the firm's loss.  *Niemi v. Lasshofer*, --- F.3d ----, 2013 WL 4767016, at *7 (10th Cir.

---

[8]Defendants assert the standing argument as to multiple claims.  The Court will address the standing issue as it pertains to each claim separately.

Sept. 6, 2013); *see also Sparling v. Hoffman Const. Co., Inc.*, 864 F.2d 635, 640-41 (9th Cir. 1988) (listing cases).  The shareholder standing rule is an equitable restriction that prohibits shareholders from initiating actions to enforce the rights of the corporation unless the corporation's management has refused to pursue the same action for reasons other than good-faith business judgment.  *Franchise Tax Bd. of Calif. v. Alcan Aluminum Ltd.*, 493 U.S. 331, 336 (1990).  Similarly, "corporate presidents ordinarily do not have standing to assert an individual RICO claim for conduct which harmed the corporation, because such injuries are derivative."  *Tal v. Hogan*, 453 F.3d 1244, 1254 (10th Cir. 2006).

An exception to the shareholder standing rule allows "a shareholder with a direct, personal interest in a cause of action to bring suit even if the corporation's rights are also implicated."  *Bixler*, 596 F.3d at 757 (citation omitted).  Plaintiff bears the burden of showing that his RICO claim falls within the exception to the shareholder standing rule and he must do so "with the manner and degree of evidence required at the successive stages of the litigation."  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).  To determine whether plaintiff has properly alleged an injury to his business or property that is independent and separate of an injury to the Yellowstone Club, the Court must first examine the alleged predicate acts that purportedly caused the injury.  *Bixler*, 596 F.3d at 758.

Plaintiff's RICO claim relates to the manner in which Credit Suisse and Cushman solicited the Yellowstone Club and arranged financing for the Yellowstone Club's activities.  Docket No. 1 at 58-67.  Specifically, plaintiff alleges that Credit Suisse,

Cushman, and Mr. Paauw were the leaders of an enterprise premised on a "Loan to Own" scheme, *id*. at 62, ¶ 137(b), which allowed Cushman to issue grossly inflated appraisals for several master-planned resort communities.  *Id*.  According to the complaint, the enterprise performed its illegal activities by (1) soliciting potential real estate developers of first class master-planned communities, (2) earning the trust and confidence of these developers and inducing these developers to borrow large sums of money based on inflated appraisal values reached through the use of the Total Net Value method, (3) issuing the loans through Credit Suisse Cayman Islands Branch to avoid the requirements of FIRREA, (4) inducing the developers to take out equity in the inflated loans, (5) providing Credit Suisse's risk management team with a contingency plan to take over the resorts through bankruptcy once the loans inevitably defaulted, and (6) collecting front-end fees for work performed in soliciting, managing, and servicing the loans.  *Id*. at 61-64, ¶¶ 137-142.  Plaintiff also alleges that "Credit Suisse [as leader of the enterprise] concealed the FIRREA frauds from the Plaintiff to convince the Yellowstone Club to engage them, then sold their lies to obtain the funds," *id*. at 64, ¶ 141, and that this "bait and switch" RICO fraudulent enterprise would not have occurred "[w]ithout the original FIRREA violations and frauds . . ., and without the bank and lending fraud . . . by Edra Blixseth acting in collusion with a Credit Suisse note-holder, CrossHarbor, to take over control of the Yellowstone Club through a fraudulently schemed bankruptcy."  *Id*. at 65, ¶ 144.

The Court finds that plaintiff's RICO claim does not sufficiently allege a personal injury independent of an injury to the Yellowstone Club.  First, it is undisputed that plaintiff signed the Credit Agreement in his capacity as president of BGI and manager

of the Yellowstone Club, Docket No. 28-2 at 49; therefore, any injury arising out of the Credit Agreement is not a personal and direct injury. *Niemi*, 2013 WL 4767016, at *8. Although plaintiff used loan proceeds for his personal use, it is undisputed that the loan itself was made to the Yellowstone Club – and not to plaintiff – meaning that a loss arising from a default would be suffered by the creditors, not the borrower. *Id.* Third, to the extent plaintiff lost control of the Yellowstone Club and lost his ownership stake in the Yellowstone Club, this harm is a derivative injury. It is the loss of a return on an investment by actions of a third party (Credit Suisse) that caused harm to a corporate entity (the Yellowstone Club), resulting in a diminution in the value of the Yellowstone Club's stock. *See Massey v. Merrill Lynch & Co., Inc.*, 464 F.3d 642, 647 (7th Cir. 2006). Thus, although plaintiff was told the alleged deceptive representations in person and signed the loan agreement, because these things occurred in his capacity as the president of BGI and manager of the Yellowstone Club, and not in his individual capacity, any harm caused by the alleged enterprise is harm to the Yellowstone Club. *See Bixler*, 596 F.3d at 758. Accordingly, plaintiff does not sufficiently allege that the direct injury exception applies to his RICO claim, and the Court will dismiss plaintiff's RICO claim for failure to state a claim. *Niemi*, 2013 WL 4767016, at * 8.

## B.  Fraud

Defendants argue that plaintiff does not have standing to assert his fraud claim. Docket No. 40 at 15; Docket No. 39 at 3-5. In response, plaintiff contends that the complaint presents a detailed case of fraud based on the representations Cushman and Credit Suisse made "by holding out to [plaintiff] that the $1.1 billion Total Net Value

14

appraisal of the Yellowstone Club which supported [Credit Suisse's] predatory $375 million loan was a legitimate appraisal when in fact it was grossly inflated." Docket No. 35 at 15. Plaintiff also argues that defendants' standing argument fails because defendants told plaintiff that he was "personally" entitled to use the proceeds from the loan "just like a home equity loan." *Id*. at 18 (citation omitted). Plaintiff asserts that the complaint alleges that Cushman and Credit Suisse became plaintiff's "lending advisors" by obtaining proprietary and financial information about the Yellowstone Club and encouraging and convincing plaintiff to use $209 million from the loan for his personal use. *Id*. at 19.

Under Montana law,[9] to allege a prima facie case of fraud, plaintiff must assert the following nine elements: (1) a representation; (2) the falsity of that representation; (3) the materiality of the representation; (4) the speaker's knowledge of the representation's falsity or ignorance of its truth; (5) the speaker's intent that the representation should be acted upon by the person and in the manner reasonably contemplated; (6) the hearer's ignorance of the representation's falsity; (7) the hearer's reliance upon the truth of the representation; (8) the hearer's right to rely upon the representation; and (9) the hearer's consequent and proximate injury or damages

---

[9]For the purpose of resolving defendants' motions to dismiss, the parties appear to agree that the elements of plaintiff's state law claims are defined by either Montana or Colorado law and that the laws of those states define the elements similarly. Thus, the Court finds that a choice of law analysis is not necessary and will apply Montana law to the state law claims presented here. Although Credit Suisse argues that the Credit Agreement contains a choice of law provision, Docket No. 28 at 11, Credit Suisse does not explain why such clause would bind a non-party to the agreement. The same is true in regard to Credit Suisse's venue argument.

caused by his or her reliance on the representation.[10]  *In re Estate of Kindsfather*, 108 P.3d 487, 490 (Mont. 2005).

As noted above, to avoid the application of the shareholder standing doctrine, plaintiff must allege that he has suffered an injury independent of an injury to the Yellowstone Club.  *Tal*, 453 F.3d at 1254.  Plaintiff has not done so here.  Although plaintiff states that defendants concealed facts regarding whether the Total Net Value appraisal complied with the USPAP and FIRREA, Docket No. 1 at 68-69, ¶ 156, and that the loan to the Yellowstone Club could be repaid by sales of lots in the ordinary course of business, *id.*, because plaintiff had access to $209 million from the Credit Suisse loan only because of his position as a manager of the Yellowstone Club, any injury resulting from plaintiff's personal use of the loan is not a direct injury to plaintiff, but rather an injury to the Yellowstone Club.  *Niemi*, 2013 WL 4767016, at *8.  The Yellowstone Club had the obligation to repay the Credit Agreement, and plaintiff was never directly or personally liable for reimbursement of the underlying loan.  Thus, because it was the Yellowstone Club that secured the loan, the Yellowstone Club that had an obligation to repay the loan, and the Yellowstone Club's properties that suffered as a result of plaintiff's personal use of the loan proceeds, plaintiff's injury is derivative. *Bixler*, 596 F.3d at 758-59.  Accordingly, because plaintiff does not sufficiently allege a

---

[10]In his response to Credit Suisse's motion to dismiss, plaintiff discusses the theory of constructive fraud.  Docket No. 35 at 14-15.  "Constructive fraud" is defined by statute in Montana.  *See* Mont. Code Ann. § 28-2-406.  Constructive fraud is essentially actual fraud without the element of intent and has similar elements as negligent misrepresentation.  *See Town of Geraldine v. Mont. Municipal Ins. Authority*, 198 P.3d 796, 801 (Mont. 2008).  Because plaintiff does not assert a claim of constructive fraud in the complaint, the Court will not consider plaintiff's arguments regarding constructive fraud.

direct injury arising out of defendants' allegedly fraudulent conduct, the Court will dismiss plaintiff's fraud claim for failure to state a claim.  *Niemi*, 2013 WL 4767016, at *8.

### C.   Breach of Fiduciary Duty

Defendants argue that plaintiff does not have standing to assert his breach of fiduciary duty claim and that, even assuming plaintiff has standing, he does not establish that Credit Suisse owed him a duty.  Docket No. 40 at 15; Docket No. 24 at 31-32.  In response, plaintiff contends that defendants had a fiduciary duty to plaintiff because they acted as his "lending advisor" and represented that he could use $209 million from the loan for personal use.  Docket No. 35 at 27-28.

In Montana, the relationship between a bank and its customer is generally described as that of debtor and creditor and does not give rise to fiduciary responsibilities.  *McCoy v. First Citizens Bank*, 148 P.3d 677, 683 (Mont. 2006).  A limited exception to this rule exists when special circumstances place a bank beyond the role of a simple creditor and into the role of advisor.  *Id*.  However, Montana courts have "recognized that no fiduciary duty arises between a bank and its borrower where the bank did not offer financial advice, its advice was not always heeded, or where the borrower was advised by others, such as legal counsel."  *Simmons Oil Corp. v. Holly Corp.*, 852 P.2d 523, 526 (Mont. 1993) (citing *Lachenmaier v. First Bank Sys., Inc.*, 803 P.2d 614, 619 (Mont. 1990)).  Whether a fiduciary duty exists is a question of law, not fact.  *McCoy*, 148 P.3d at 683.

In regard to his fiduciary duty claim, the Court finds that plaintiff has not established that he suffered an injury independent of an injury suffered by the Yellowstone Club. *Tal*, 453 F.3d at 1254. Because plaintiff's claim relies on the same facts as his fraud claim, namely, Credit Suisse's alleged fraudulent loan, plaintiff cannot show what independent harm he suffered from such a loan. *Id*. Even assuming that Credit Suisse and Cushman acted as a form of financial advisor to plaintiff, this allegation is insufficient to allege a fiduciary relationship because plaintiff asserts that he had independent legal advice. *See* Docket No. 1 at 5-6, ¶ 20 (referring to developers' lawyers); *id*. at 12-13, ¶¶ 32-33 (with regard to Credit Suisse's role as "lending advisors" to plaintiff, plaintiff "relied upon his lawyers") ; *id*. at 18-19, ¶¶ 47 (referring to his lawyers' involvement in plaintiff's dealing with the banks); *Simmons*, 852 P.2d at 526. Thus, because plaintiff does not sufficiently allege that he suffered an injury independent of an injury to the Yellowstone Club and does not sufficiently allege that defendants owed him a fiduciary duty, the Court will dismiss plaintiff's breach of fiduciary duty claim. *Simmons*, 852 P.2d at 526.

### D.   Negligence and Negligent Misrepresentation

Defendants argue that plaintiff cannot state a claim of negligence and negligent misrepresentation because he has not shown that defendants owed him a duty. Docket No. 28 at 27-28; Docket No. 24 at 30-31. In response, plaintiff argues that he was a foreseeable victim of defendants' misleading appraisals and that misrepresentations in real estate appraisals may give rise to a claim of negligence or negligent misrepresentation. Docket No. 34 at 30-31; Docket No. 35 at 28-29.

18

Under Montana law, a cause of action for negligence requires a plaintiff to prove the following four elements: (1) duty; (2) breach of duty; (3) causation; and (4) damages. *Brown v. Demaree*, 901 P.2d 567, 569 (Mont. 1995). By contrast, the tort of negligent misrepresentation requires proof of the following elements: (1) the defendant made a representation as to a past or existing material fact; (2) the representation was untrue; (3) regardless of its actual belief, the defendant made the representation without any reasonable ground for believing it to be true; (4) the representation was made with the intent to induce the plaintiff to rely on it; (5) the plaintiff was unaware of the falsity of the representation and justifiably acted in reliance upon the truth of the representation; (6) the plaintiff, as a result of his or her reliance, sustained damages. *Kurtzenacker v. Davis Surveying, Inc.*, 278 P.3d 1002, 1007-1008 (Mont. 2012). An action for negligent misrepresentation is an action in fraud, *see Bushnell v. Cook*, 718 P.2d 665, 668 (Mont. 1986); thus, plaintiff's pleading of fraud must meet the standard set forth in Rule 9(b). *See Town of Geraldine*, 198 P.3d at 801 (noting that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity") (citing Mont. R. Civ. P. 9(b)).

In support of his negligence and negligent misrepresentation claims, plaintiff alleges the same facts discussed above in relation to the fraud claim, namely, that defendants induced plaintiff to sign the Credit Agreement through an inflated appraisal when defendants knew the appraisal was fraudulent. Docket No. 1 at 72-73, ¶¶ 170-176.

Because plaintiff's negligence and negligent misrepresentation claims are based on statements Cushman and Credit Suisse made to plaintiff in his capacity as the

19

president and manager of the Yellowstone Club, plaintiff has not shown a direct injury that is separate from the injury suffered by Yellowstone Club. *Bixler*, 596 F.3d at 758-59; *Tal*, 453 F.3d at 1254. As a result, the Court will dismiss plaintiff's negligence and negligent misrepresentation claims. *Niemi*, 2013 WL 4767016, at * 8.

### E.   Breach of Contract

Credit Suisse argues that plaintiff's breach of contract claim is barred by the exculpation clause contained in the Third Amended Plan of Reorganization, which indemnifies Credit Suisse from "any liability to any Person for any act or omission in connection with, relating to or arising out of the Chapter 11 Cases."[11] Docket No. 28 at 9; Docket No. 28-12 at 48. In response, plaintiff argues that the exculpation clause is invalid because "it is well established that the Bankruptcy Code (and Due Process for that matter) does not allow a plan of reorganization to release a non-debtor from liability to third parties." Docket No. 35 at 6 (citations omitted). Plaintiff also claims that the exculpation clause does not apply because it expressly does not indemnify parties for claims arising out of "willful misconduct or gross negligence." Docket No. 28-12 at 48, § 8.4.

Plaintiff's breach of contract claim is based on the theory that he is a third party beneficiary of the Credit Agreement. Docket No. 1 at 80, ¶ 202. Plaintiff asserts that the Credit Agreement contains a non-recourse clause to shield managers or partners of the Yellowstone Club, such as himself, from personal liability arising out of a default on the loan. *Id*. at ¶ 204. He claims that Credit Suisse breached the non-recourse clause

---

[11]As noted above, plaintiff voluntarily dismissed his breach of contract claim against Cushman. *See* Docket No. 34 at 34.

of the Credit Agreement when it agreed to participate in the Third Amended Plan of Reorganization and seek to recover the proceeds of the Yellowstone Club's loan from plaintiff in his individual capacity. *Id*. at 80-81, ¶203.  Plaintiff asserts that, as a third party beneficiary, plaintiff can sue for any damages arising from such breach. *Id*. at 80-81, ¶¶ 204, 207.  Before reaching the merits of plaintiff's breach of contract claim, the Court will address the whether plaintiff can raise these claims in light of the exculpatory clause.

Although plaintiff claims that the bankruptcy court does not have the authority to issue an order exculpating Credit Suisse from all and any liability that may arise out of the Yellowstone Club's Chapter 11 proceedings, plaintiff acknowledges that the bankruptcy court for the District of Montana confirmed the Yellowstone Club's Third Amended Plan of Reorganization and that its order doing so is valid and enforceable. *See In re Yellowstone Mountain Club, LLC*, 436 B.R. 598, 634 (Bankr. D. Mont. 2010). In addition, plaintiff does not identify any authority allowing this Court to ignore a valid order from a bankruptcy court.  *See, e.g.,* 28 U.S.C. § 158(a) (noting that an appeal from a bankruptcy court "shall be taken only to the district court for the judicial district in which the bankruptcy judge is serving"); *cf. Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 152 (2009) (noting that a bankruptcy court's plan confirmation order cannot, after it becomes final, be collaterally attacked).

In addition, although plaintiff argues that the exculpation clause does not bar claims based on intentional and willful misconduct, the Court finds that plaintiff's claim for breach of contract, as pled, does not sufficiently allege any willful misconduct or

gross negligence.  Accordingly, the Court finds that the exculpatory clause bars plaintiff's breach of contract claim and will therefore dismiss it.[12]

### F.   Tortious Interference with Contractual Relations

Credit Suisse argues that plaintiff does not sufficiently allege a claim of tortious interference with contractual relations because plaintiff does not allege that Credit Suisse caused any party to breach a contract it had with plaintiff.[13]  Docket No. 28 at 28.  Credit Suisse also argues that plaintiff's case is premature because plaintiff's damages are uncertain and speculative at this time.  *Id*. at 29.  In response, plaintiff contends that he has alleged sufficient facts to show that Credit Suisse "improperly" interfered with his contractual rights when it caused the Yellowstone Club entities not to honor the releases of liability which plaintiff secured as part of the MSA.  Docket No. 35 at 34.  In addition, plaintiff asserts that Credit Suisse caused the Yellowstone Club entities and Edra Blixseth to breach the MSA, which allowed the Liquidation Trust to seek reimbursement of the loan directly from plaintiff.  *Id*.

---

[12]The Court takes judicial notice of the fact that District Court for the District of Montana has affirmed the Third Amended Plan of Reorganization on appeal.  *See Timothy L. Blixseth v. Yellowstone Mountain Club, LLC*, No. 11-cv-65-BU-SEH (D. Mont. 2011) [Docket No. 121, March 6, 2013].  *See Guttman v. Khalsa*, 669 F.3d 1101, 1127 n. 5 (10th Cir. 2012) (stating that court can take judicial notice of public records).

[13]As noted above, plaintiff voluntarily dismissed his claim of tortious interference with contractual relations against Cushman.  *See* Docket No. 34 at 34.  Credit Suisse argues that the exculpation clause also bars plaintiff's claims for tortious interference with contractual relations and breach of the implied covenant of good faith and fair dealing against Credit Suisse.  However, the Court will address such claims given that it is at least arguable that these claims fall within the "willful misconduct or gross negligence" exception of the exculpation clause.  Docket No. 28-12 at 48, § 8.4.

Under Montana law, a tortious interference with contract claim requires the claimant to establish that the defendant's acts: (1) were intentional and willful; (2) were calculated to cause damage to the claimant's business; (3) were done with the unlawful purpose of causing damage or loss, without right or justifiable cause on the part of the actor; and (4) that actual damages and loss resulted. *Emmerson v. Walker*, 236 P.3d 598, 603 (Mont. 2010). Tortious interference with contractual relations requires proof of malice in the legal sense – that the defendant acted wrongfully, unlawfully, or without justification or excuse. *Richland Nat'l Bank & Trust v. Swenson*, 816 P.2d 1045, 1051 (1991).

The Court finds that plaintiff has adequately pled the four elements of a tortious interference with contract claim. Plaintiff alleges that Credit Suisse, with the assistance of CrossHarbor, directed the Liquidating Trustee to invalidate the releases in the MSA. Docket No. 1 at 75, ¶ 187. Plaintiff asserts that such actions on the part of Credit Suisse were intentional and motivated by Credit Suisse's desire to recoup the proceeds of the loan it provided to the Yellowstone Club. *Id*. at 76, ¶ 189. Plaintiff also claims that Credit Suisse performed these actions with the specific intent to cause plaintiff a loss of over $280 million in personal assets. *Id*. at ¶ 190. Finally, plaintiff suffered damages in the form of accrued attorneys' fees and is likely to suffer additional damages if judgments are entered against him in the various proceedings currently pending against him. *Id*. at 77, ¶ 192. Based on the foregoing, the Court finds that plaintiff has sufficiently alleged that Credit Suisse intentionally interfered with plaintiff's

contractual rights under the MSA.  *See Tindall v. Konitz Contracting, Inc.*, 783 P.2d 1376, 1381 (Mont. 1989).

### G.   Breach of Covenant of Good Faith and Fair Dealing

Credit Suisse argues that plaintiff has not sufficiently alleged a claim for breach of the covenant of good faith and fair dealing because such a claim is not actionable for misrepresentations made before a contract is formed.[14]  Docket No. 28 at 29.  In addition, Credit Suisse asserts that New York law does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing not represented in the contract.  Docket No. 28 at 30.  In response, plaintiff argues that the tort of breach of the implied covenant of good faith and fair dealing is actionable in Colorado and Montana and that his complaint adequately asserts such a claim.  Docket No. 35 at 30-31.

Under Montana law, every contract entered into, regardless of type, contains an implied covenant of good faith and fair dealing.  *Story v. City of Bozeman,* 791 P.2d 767, 775 (Mont. 1990).  The implied covenant of good faith and fair dealing is breached where one party uses discretion conferred by the contract to unfairly deprive the other party of the benefit of the bargain by acting dishonestly or abusing discretion granted by the contract.  *Phelps v. Frampton*, 170 P.3d 474, 484 (Mont. 2007).  The covenant is measured by the justifiable expectations of the parties, and expectations that contradict an express term of the contract are per se unjustifiable.  *Hardy v. Vision Service Plan*,

---

[14]Although plaintiff does not expressly dismiss his claim against Cushman for breach of the implied covenant of good faith and fair dealing, the Court will dismiss this claim against Cushman because plaintiff did not present any arguments in support of this claim in his response to Cushman's motion.  *See* Docket No. 34 at 30-35.

120 P.3d 402, 405 (Mont. 2005).  An "alleged implied covenant cannot be in direct contradiction of the written term contract" and cannot "be read to prohibit a party from doing that which is expressly permitted by an agreement."  *Farris v. Hutchinson*, 838 P.2d 374, 376-77 (Mont. 1992) (citation omitted).

Plaintiff alleges that Credit Suisse breached the covenant of good faith and fair dealing when it (1) misrepresented the true value of the Yellowstone Club by using an inflated appraisal created using the Total Net Value method and (2) participated in the Third Amended Plan of Reorganization for the Yellowstone Club seeking reimbursement of the $375 million loan.  Docket No. 1 at 78-79.  The Court finds that plaintiff fails to assert a claim for breach of the covenant of good faith and fair dealing based on the representations Credit Suisse made about the value of the Yellowstone Club before plaintiff signed the Credit Agreement because the implied covenant of good faith and fair dealing focuses on the performance of the contract, and not on pre-contractual misrepresentations.  *Story*, 791 P.2d at 775 (noting that the implied covenant of good faith ensures that "[e]ach party to a contract has a justified expectation that the other will act in a reasonable manner in its performance").

With regard to plaintiff's claim against Credit Suisse based on Credit Suisse's participation in the Third Amended Plan of Reorganization, the Court finds that plaintiff does not assert an actionable claim because he does not state that Credit Suisse abused its discretion under the Credit Agreement.  *See Phelps*, 170 P.3d at 484.  In other words, even assuming plaintiff's allegations are true, there are no allegations that Credit Suisse performed an unreasonable banking practice in agreeing to the Third Amended Plan of Reorganization once the Yellowstone Club had defaulted on the

Credit Agreement.  *See Story*, 791 P.2d at 775 (noting that the conduct required by the "implied covenant of good faith and fair dealing is honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade").  Assuming that Credit Suisse voluntarily joined the Third Amended Plan of Reorganization, there is no evidence that this decision was anything other than sound business judgment in an attempt to recoup the proceeds of its loan.  *See Lachenmaier v. First Bank Sys., Inc.*, 803 P.2d 614, 617 (Mont. 1990) (noting that bank did not breach "honesty in fact" standard required of contracting parties when it continued to loan and encourage borrowers to borrow more money simultaneously with the plans of the regional office to liquidate borrowers' assets and foreclose on debt).  Accordingly, because plaintiff does not sufficiently allege that Credit Suisse abused its discretion under the Credit Agreement, the Court will dismiss plaintiff's claim for breach of the implied covenant of good faith and fair dealing for failure to state a claim.  *Id*.

### H.  Equitable indemnity

Plaintiff indicated in his responses to defendants' motions to dismiss that he is no longer pursuing his claim for equitable indemnity and requests that the Court dismiss this claim without prejudice.  Docket No. 34 at 34; Docket No. 35 at 35.  Accordingly, the Court will dismiss plaintiff's equitable indemnity claim without prejudice.

### I.  Conspiracy

Defendants argue that plaintiff does not sufficiently allege a claim of conspiracy because (1) plaintiff's claim is not pled with particularity in accordance with Rule 9(b) of the Federal Rules of Civil Procedure, (2) plaintiff fails to establish an independent cause

of action for his civil conspiracy claim, and (3) plaintiff does not sufficiently allege a meeting of the minds between Cushman and Credit Suisse.  Docket No. 28 at 34.  In response, plaintiff argues that he sufficiently alleges a conspiracy because it is plausible to infer from his complaint that Credit Suisse and Cushman conspired to circumvent U.S. banking laws, had a meeting of the minds to create a Total Net Value appraisal, and committed multiple counts of wire fraud.  Docket No. 34 at 15.

Under Montana law, the elements of a civil conspiracy are (1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful overt acts; and (5) damages as the proximate result thereof.  *Schumacker v. Meridian Oil Co.*, 956 P.2d 1370, 1374 (Mont 1998).  Moreover, it is not the conspiracy itself that gives rise to a cause of action; it is the torts committed or the wrong done in furtherance of a civil conspiracy that do so.  *Id*. "If the object of an alleged 'conspiracy' is lawful, and the means used to attain that object are lawful, there can be no civil action for conspiracy.  The foregoing is true even though damage may result to the plaintiffs and even though defendants may have acted with a malicious motive."  *Simmons*, 852 P.2d at 530.

Plaintiff alleges that defendants, in connection with Mr. Byrne, CrossHarbor, and Edra Blixseth, aided and abetted an unlawful scheme to earn excessive fees and gain ownership and control over the Yellowstone Club at the expense of the developers, homeowners, and plaintiff.  Docket No. 1 at 83, ¶¶ 215-217.  As noted above, any harm plaintiff suffered as a result of the loss of his ownership stake in the Yellowstone Club is a derivative injury.  Plaintiff does not sufficiently allege that the direct injury exception applies to his conspiracy claim.  *See Niemi*, 2013 WL 4767016, at * 8; *Bixler*, 596 F.3d

27

at 758.  Moreover, the Court has dismissed all of plaintiff's underlying tort claims.  As a result, plaintiff cannot state a plausible claim of civil conspiracy because he cannot sustain an independent conspiracy claim absent a tort or wrong committed in furtherance of the conspiracy.  *Schumacker*, 956 P.2d at 1374.  Accordingly, the Court will dismiss plaintiff's civil conspiracy claim for failure to state a claim upon which relief can be granted.

### J.   Request for Leave to Amend Complaint

In his responses, plaintiff requests leave to file an amended complaint should the Court find that he does not assert plausible claims for relief.  Docket No. 34 at 34; Docket No. 35 at 35.  Plaintiff, however, does not attach a proposed amended complaint to his responses and does not explain in any detail how his proposed amendments would cure the alleged pleading defects.

Rule 15(a) of the Federal Rules of Civil Procedure instructs courts to "freely give leave [to amend] when justice so requires."  Fed. R. Civ. P. 15(a).  Nevertheless, denying leave to amend is justified if the proposed amendments are unduly delayed, unduly prejudicial, futile, or sought in bad faith.  *Foman v. Davis*, 371 U.S. 178, 182 (1962); *Frank v. U.S. West, Inc.*, 3 F.3d 1357, 1365 (10th Cir. 1993).  As a general rule, the Court retains the discretion to permit such amendments.  *Minter v. Prime Equip. Co.*, 451 F.3d 1196, 1204 (10th Cir. 2006).

The Court finds that it would be futile to give plaintiff an opportunity to amend his complaint with regard to his RICO, common law fraud, breach of fiduciary duty, common law negligence, negligent misrepresentation, and common law conspiracy

28

claims because plaintiff has not presented any facts that he could uncover if granted leave to amend his complaint to raise a plausible inference that he sustained a direct injury as a result of defendants' actions.  *See Bixler*, 596 F.3d at 758.  Accordingly, the Court will deny plaintiff's motion to amend with regard to those claims.  *Minter*, 451 F.3d at 1204.  The Court will grant plaintiff leave to amend his claim against Credit Suisse for breach of the implied covenant of good faith and fair dealing.

## IV.  CONCLUSION

For the foregoing reasons, it is

**ORDERED** that the Motion to Dismiss by Cushman & Wakefield, Inc., Cushman & Wakefield of Colorado, Inc. and Dean Pauww [Docket No. 24] is **GRANTED**.  It is further

**ORDERED** that Defendants Credit Suisse AG, Credit Suisse Securities (USA), LLC, Credit Suisse (USA) Inc., Credit Suisse Holdings (USA) Inc. and Credit Suisse Cayman Island Branch's Motion to Dismiss the Complaint [Docket No. 28] is **GRANTED** in part and **DENIED** in part as indicated in this Order.  It is further

**ORDERED** that all of plaintiff Timothy L. Blixseth's claims against defendants Cushman & Wakefield, Inc., Cushman & Wakefield of Colorado, Inc. and Dean Pauww are dismissed.  It is further

**ORDERED** that plaintiff Timothy L. Blixseth's first, second, third, fourth, sixth, seventh, eighth, and ninth claims against Credit Suisse are dismissed.  Plaintiff may proceed with his fifth claim against Credit Suisse.

DATED September 30, 2013.

BY THE COURT:

s/Philip A. Brimmer
_____
PHILIP A. BRIMMER
United States District Judge