IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No. 12-cv-00393-PAB-KLM

TIMOTHY L. BLIXSETH, an individual,

      Plaintiff,

v.

CREDIT SUISSE AG, a Swiss corporation,
CREDIT SUISSE GROUP AG, a Swiss corporation,
CREDIT SUISSE SECURITIES (USA), LLC, a Delaware limited liability company,
CREDIT SUISSE (USA), INC., a Delaware corporation,
CREDIT SUISSE HOLDINGS (USA), INC., a Delaware corporation,
CREDIT SUISSE CAYMAN ISLAND BRANCH, an entity of unknown type, and
DOES 1-100,

      Defendants.

---

## ORDER

---

      This matter is before the Court on the Motion for Summary Judgment [Docket No. 117] filed by Credit Suisse AG, Credit Suisse Securities (USA), LLC, Credit Suisse (USA) Inc., Credit Suisse Holdings (USA) Inc., and Credit Suisse Cayman Islands Branch (collectively, "Credit Suisse.")

## I. BACKGROUND[1]

      Timothy Blixseth and his former wife, Edra Blixseth, founded the Yellowstone Mountain Club, LLC ("Yellowstone Club"), a master-planned golf and ski resort development in Montana.  Docket No. 115 at 1-2, ¶ 1.  Cushman & Wakefield of

---

[1]The following facts are undisputed unless otherwise indicated.  Plaintiff's allegations have been set forth at length elsewhere and will not be restated here except as relevant to resolving the present motion.  Docket No. 61 at 2-10.

Colorado, Inc. ("Cushman") appraised the Yellowstone Club, valuing it at $1.165 billion as of July 2005. Docket No. 123 at 7, ¶ 51. Plaintiff was the sole shareholder of Blixseth Group, Inc. ("BGI"), later known as BLX Group, Inc. ("BLX"), until August 2008. Docket No. 115 at 2, ¶¶ 2-3.[2] BGI was the majority owner of the Yellowstone Club, Yellowstone Development, LLC ("YD"), and Big Sky Ridge, LLC ("BSR") (collectively, the "borrowers"). *Id.* at 1-2, ¶¶ 1, 2.

In 2005, Credit Suisse arranged a $375 million loan to the borrowers, the terms of which were set forth in the Credit Agreement dated September 30, 2005. *Id.* at 2, ¶ 4. Plaintiff signed the Credit Agreement on behalf of the Yellowstone Club as president of BGI. *Id.* at 2, ¶ 6. Credit Suisse signed the Credit Agreement as administrative agent, collateral agent, paying agent, sole lead arranger, and sole bookrunner. *Id.* at 2, ¶ 5. Section 9.20 of the Credit Agreement stated:

> No Recourse to Partners. Notwithstanding anything in any of the Loan Documents to the contrary, no partner or member or managing member in the Borrower shall be personally liable for the payment of the Obligations; provided, however, nothing contained herein shall release, diminish or impair the obligations of the Borrower to pay in full when due all Obligations in accordance with the provisions of the Loan Documents.

Docket No. 28-2 at 47, § 9.20 (the "no recourse provision"). On September 28, 2005, the Yellowstone Club, YD, BSR, and Credit Suisse executed a Mortgage, Security Agreement, Assignments of Rents and Leases and Fixture Filing (the "Security Agreement"). Docket No. 115 at 3, ¶ 9. Pursuant to the Credit Agreement and the Security Agreement, repayment of the Credit Suisse loan was secured by a majority of the borrowers' assets (the "collateral"). Docket No. 123-1 at 4.

---

[2]The Court refers to the BGI/BLX entity as "BGI."

Pursuant to the Credit Agreement, Credit Suisse transferred approximately $342 million to the borrowers.  Docket No. 123 at 2, ¶ 6.  The Yellowstone Club transferred approximately $209 million of those funds to BGI, who in turn distributed approximately $199 million directly to plaintiff in the form of notes (the "BGI notes").  Docket No. 115 at 3, ¶ 11; Docket No. 117 at 5, ¶¶ 6-7.

## A.  Divorce Proceedings

In 2006, plaintiff and Ms. Blixseth began divorce proceedings.  Docket No. 115 at 3, ¶ 12.  On June 26, 2008, plaintiff and Ms. Blixseth settled their divorce and agreed to divide their marital assets pursuant to the Martial Settlement Agreement ("MSA").  *Id.* at 3, ¶ 14; *see also* Docket No. 123-15.  Pursuant to the MSA, plaintiff transferred ownership of BGI to Ms. Blixseth.  Docket No. 115 at 3, ¶ 15.  In her capacity as president of BGI, Ms. Blixseth executed the Assumption Agreement, which stated, in relevant part, "BGI hereby releases [Mr. Blixseth] from any and all claims, obligations or liabilities associated with the BGI Indebtedness.  Simultaneously herewith, BGI is delivering the original [Promissory Notes] to [Edra Blixseth] to be marked 'Superceded by Replacement Note.'"  Docket No. 123-13 at 3, ¶ 4; *see also* Docket No. 115 at 4, ¶¶ 16, 18.[3]  Pursuant to the Assumption Agreement, the BGI notes were marked "Superseded by Replacement Note."  Docket No. 117 at 5, ¶ 11.  As part of the MSA and in conjunction with the Assumption Agreement, plaintiff and Ms. Blixseth executed the Mutual Waiver and Release Agreement (the "releases").  Docket No. 115 at 4, ¶ 21; *see also* Docket No. 123-11.  The releases state: "each of the Edra Entities hereby fully

---

[3]The term "BGI Indebtedness" as it is used in the Assumption Agreement refers to the promissory notes executed by plaintiff in favor of BGI.  *Id.* at 4, ¶ 17.

and absolutely releases and discharges Timothy and each of the Timothy Entities

(collectively, the "Timothy Released Parties"), from any claim, right or demand that any

such Edra Entity has, or may have against any of the Timothy Released Parties . . . ."

Docket No. 123-11 at 3.  On July 3, 2008, as part of the Blixseths' divorce, the

California Superior Court approved the releases.  Docket No. 115 at 4, ¶ 22; *see also*

Docket No. 123-12 at 2.

### B.  Bankruptcy[4]

On November 10, 2008, the Yellowstone Club, YD, BSR, and Yellowstone Club

Construction Company, LLC (collectively, the "debtors") filed for Chapter 11 bankruptcy

protection (the "Yellowstone Club bankruptcy") in the United States Bankruptcy Court

for the District of Montana (the "bankruptcy court").  Docket No. 115 at 5, ¶ 24; *see also*

*In re Yellowstone Mountain Club, LLC* ("*YMC Bankruptcy*"), No. 08-61570-RBK (Bankr.

---

[4]To the extent plaintiff objects on hearsay grounds to the consideration of documents filed in other cases or findings of fact and rulings from other courts, plaintiff's objection is sustained in part and overruled in part.  An out-of-court written statement by a judge offered to prove the truth of a fact asserted therein is, absent an applicable hearsay exception, inadmissable hearsay.  *Herrick v. Garvey*, 298 F.3d 1184, 1191-92 (10th Cir. 2002).  In *Herrick*, for example, a plaintiff sought to rely at summary judgment on a district court opinion from a different case in which the court made a finding of fact that a corporation sold its airplane manufacturing business.  *Id.* at 1191.  The Tenth Circuit held that admitting the written statement by the judge for the truth of the matter asserted, namely, that the corporation did in fact sell its airplane manufacturing business, was inadmissable hearsay.  *Id.* at 1191-92.  Thus, to the extent either party seeks to rely on documents from other courts or findings of fact from another court to establish the truth of a fact asserted therein, such reliance constitutes inadmissible hearsay.  However, to the extent the parties rely on documents, findings of fact, or rulings from another court to establish the mere fact a party made a particular assertion or argument or to establish that another court made a particular finding or ruling, such a use is not for the truth of the matter asserted therein and does not therefore constitute hearsay.  In resolving this motion, the Court considers documents filed in other cases and findings of fact and rulings from other courts only for the latter purpose.

D. Mont. Nov. 10, 2008) (Docket No. 1).[5]

In May 2009, Credit Suisse, in its capacity as an agent for the prepetition lenders[6] ("prepetition agent"), the Official Unsecured Creditors Committee ("UCC"), the debtors, and CrossHarbor Capital Partners, LLC negotiated and executed the Settlement Term Sheet [Docket No. 123-21].  The Settlement Term Sheet, among other things, released the UCC's and debtors' claims against Credit Suisse and provided for the creation of the Yellowstone Club Liquidating Trust ("Liquidating Trust" or "YCLT"), which would hold the debtors' claims, causes of action, and other assets.  Docket No. 123-21 at 4-5, 8-9; Docket No. 115 at 8, ¶ 51.  The Settlement Term Sheet provided that the Liquidating Trust would be governed by a seven member board.  *Id.* at 8, ¶ 46. Credit Suisse had the right to appoint four members to the Liquidating Trust board.  *Id.* The Settlement Term Sheet provided that board decisions would be made by majority vote, with the exception of retaining new counsel, which required a unanimous vote, and the settlement of certain claims, which required at least five votes.  *Id.* at 8, ¶ 47. On May 22, 2009, the debtors filed a Third Amended Joint Plan of Reorganization ("Third Amended Plan") [Docket No. 123-23], which incorporated the Settlement Term Sheet and provided for the resolution "of the outstanding claims against and interests in the Debtors."  *YMC Bankruptcy* (Docket No. 947 at 9); Docket No. 123-23 at 52, § 9.2.5.  Credit Suisse was among those entities that helped to draft and voted in

---

[5]The YD, BSR, and Yellowstone Club Construction Company, LLC bankruptcy cases were jointly administered under Case No. 08-61570-RBK.

[6]The prepetition lenders are those entities that advanced the loan funds to the borrowers under the Credit Agreement.

support of the Third Amended Plan.  Docket No. 123 at 9, ¶ 59.  On June 2, 2009, the

bankruptcy court confirmed the Third Amended Plan.  Docket No. 115 at 8, ¶ 49.  Marc

S. Kirschner was appointed trustee of the Liquidating Trust.  *YMC Bankruptcy* (Docket

No. 1065).  On July 17, 2009, the Third Amended Plan took effect and the debtors'

claims were assigned to the Liquidating Trust.  Docket No. 115 at 9, ¶ 52; *YMC*

*Bankruptcy* (Docket No. 1119 at 1).[7]

Plaintiff asserts that the Third Amended Plan and Settlement Term Sheet made

him the sole target in funding the Yellowstone Club bankruptcy plan, while releasing

Credit Suisse from liability.  Docket No. 123 at 8-9, ¶¶ 57, 59-60.  He further contends

that Credit Suisse asserts control over the Liquidating Trust because

> (1) CS is a beneficiary of the YCLT as an recipient of allowed claims 3
> and 8; (2) CS appoints 4 of 7 members on the YCLT Board with a majority
> vote; (3) the Board advises and directs the trustee; (4) Majority vote
> appoints the Trustee; (5) Trust Board Advises, instruction and direction
> [sic] on administration and assists in the pursuit of Trust Claims, as
> requested; (6) CS-appointed members['] votes must [] approve any
> settlement with Mr. Blixseth (5 of 7 votes to settle); and (7) CS' local
> counsel in YMC bankruptcy, Holland & Hart, is designated as counsel for
> the YCLT, and cannot be removed absent unanimous approval.

*Id.* at 8-9, ¶ 58 (citations omitted).

## C.  AP-14

On February 25, 2009, before the Settlement Term Sheet was agreed to, Credit

---

[7]Plaintiff appealed the bankruptcy court's order confirming the Third Amended
Plan to the district court.  The district court reversed and remanded on narrow grounds.
*Blixseth v. Yellowstone Mountain Club, LLC*, 2010 WL 4371368, at *1 (D. Mont. Nov. 2,
2010).  On remand, the bankruptcy court addressed the issues raised by plaintiff's initial
appeal.  *YMC Bankruptcy* (Docket No. 2281).  On August 11, 2011, plaintiff again
appealed the bankruptcy court's decision to confirm the plan.  *Id.* (Docket No. 2289).
On March 6, 2013, the district court dismissed plaintiff's appeal.  *Id.* (Docket No. 2521).

Suisse filed an adversary proceeding ("AP-14") against the debtors and the UCC in the bankruptcy court.  Docket No. 115 at 5, ¶ 26; *see also Blixseth v. Kirschner* ("*AP-14*"), AP No. 09-00014-RBK (Bankr. D. Mont. Feb. 25, 2009) (Docket No. 1).  The UCC then filed a complaint against Credit Suisse and John Does 1-15 in a separate adversary proceeding, which was consolidated with AP-14 on March 3, 2009.  *AP-14* (Docket No. 20).  On March 24, 2009, plaintiff filed a complaint in intervention against the debtors and the UCC in AP-14.  *AP-14* (Docket No. 38).  On April 3, 2009, the UCC filed an answer asserting counterclaims against plaintiff for breach of fiduciary duty, alter ego, and recovery of fraudulent transfers.  *Id.* (Docket No. 98 at 21-25).

Part I of the trial in AP-14 was held over the course of six days in late April and early May 2009.  Docket No. 115 at 6, ¶ 36.  The UCC claimed that Credit Suisse aided and abetted plaintiff's breach of fiduciary duties, that the Credit Suisse loan was a fraudulent transfer, and that Credit Suisse's claims should subordinated.  *AP-14* (Docket No. 257-1 at 3-4).  The UCC claimed that plaintiff breached his fiduciary duty to the debtors, was the alter-ego of BGI, and that transfer of the Credit Suisse loan proceeds to BGI and plaintiff was a fraudulent transfer.  *Id.* (Docket No. 257-1 at 6).  Through its complaint, Credit Suisse sought, among other things, a declaratory judgment that its loan to the borrowers was not a fraudulent transfer and that its liens on the debtors' property securing the loan were valid, enforceable, and not subject to avoidance or subordination.  *Id.* (Docket No. 257-1 at 4).  Plaintiff sought declaratory judgments that transfer of the Credit Suisse loan proceeds was not a fraudulent transfer, that the releases barred all claims brought by the debtors, and that he did not

breach his fiduciary duties to the debtors.  *Id.* (Docket No. 38 at 14).  On May 12, 2009, the bankruptcy court issued a partial order, ruling that Credit Suisse's claims should be equitably subordinated pursuant to 11 U.S.C. § 510(c).  *Id.* (Docket No. 289 at 20).  On June 11, 2009, the bankruptcy court deferred ruling on the remaining claims in AP-14 to give the parties time to present additional evidence and to permit plaintiff an opportunity to further develop the merits of his case.  *Id.* (Docket No. 292 at 34).  On June 29, 2009, pursuant to the Settlement Term Sheet, the claims brought by or against Credit Suisse were dismissed.  *Id.* (Docket No. 297-298).  The bankruptcy court vacated its May 12, 2009 interim order.  *Id.* (Docket No. 299).

On September 18, 2009, the Liquidating Trust was substituted for the debtors and the UCC as a party in AP-14, leaving the Liquidating Trust and plaintiff as the only parties to AP-14.  Docket No. 115 at 9, ¶ 53.  On January 25, 2010, the Liquidating Trust filed an amended answer and counterclaims.  *AP-14* (Docket No. 487).  On February 17, 2010, the bankruptcy court entered the Amended Final Pretrial Order.  *AP-14* (Docket No. 538; Docket No. 542).  The final pretrial order stated that the two central issues in the case were

> (i) whether Mr. Blixseth breached his fiduciary duties to the Debtors by causing the Borrowers to enter into the Credit Suisse Loan and by subsequently using the proceeds for his personal benefit and for the benefit of third parties, and the damage, if any, caused by the alleged breaches; and (ii) whether the Credit Suisse Loan and the subsequent transfers of those loan proceeds were fraudulent transfers under Montana state law.

*Id.*, Docket No. 538 at 3.  Plaintiff sought a declaratory judgment that, among other things, (1) he had been released from liability for any claim asserted by the debtors, (2) the loan or portion of the Credit Suisse loan transferred to BGI was not a fraudulent

transfer, (3) the debtors' claims were barred as a matter of law, and (4) that "the real party in interest of said Trust is Credit Suisse, which is contractually prohibited from pursuing claims against Timothy Blixseth on a non-recourse loan." *Id.* (Docket No. 538 at 3-4).  The Liquidating Trust sought, among other things, (1) a determination that the transfer of the Credit Suisse loan proceeds to plaintiff was a fraudulent transfer under Montana law, and (2) a determination that the releases executed in conjunction with the MSA constituted a fraudulent transfer.  *Id.* (Docket No. 538 at 25-26).  Plaintiff asserted multiple defenses, including that the Liquidating Trust's claims were barred due to "the Trust's lack of standing because it is controlled by a party who participated in the allegedly bad behavior."  *Id.* (Docket No. 538 at 7).  The Liquidating Trust also asserted multiple defenses, including that it had standing to assert its claims by virtue of the Third Amended plan and the arguments it advanced in its response to plaintiff's motion for summary judgment.  *Id.* (Docket No. 538 at 6).  The amended final pretrial order listed the legal issues the parties anticipated arguing at trial, which included whether the releases may be set aside as a fraudulent transfer and whether the Liquidating Trust's counterclaims against plaintiff were barred by the Trust's lack of standing because it is controlled by a party who participated in the allegedly bad behavior.  *Id.* (Docket No. 538 at 27-28).[8]

In February 2010, the bankruptcy court held Part II of the AP-14 trial over the course of three days.  *Id.* (Docket No. 557).  Both parties submitted post-trial briefs,

---

[8]Plaintiff asserted this argument in his motion for summary judgment in AP-14. *Id.* (Docket No. 486 at 5).  The bankruptcy court ruled that plaintiff failed to show the "absence of a genuine issue of material fact regarding whether or not Credit Suisse controls the Trust."  *Id.* (Docket No. 535 at 22).

addressing, among other things, plaintiff's argument that Credit Suisse controlled the Liquidating Trust and was attempting to circumvent the no recourse provision of the Credit Suisse loan. *Id.* (Docket No. 569 at 50-53; Docket No. 571 at 41-49).

On August 16, 2010, the bankruptcy court issued a memorandum of decision resolving AP-14. *AP-14*, 436 B.R. 598 (Bankr. D. Mont. 2010).[9] The bankruptcy court ruled that plaintiff's use of the Credit Suisse loan proceeds was a fraudulent transfer. *Id.* at 656. The bankruptcy court next considered whether the releases were actually and constructively fraudulent transfers pursuant to Mont. Code. Ann. § 31-2-333(1). *Id.* at 661. The bankruptcy court construed the releases under California law, ruling that plaintiff "obtained the Release with the actual intent to hinder, delay and defraud his creditors, including the Debtors. As such, the Release is, for purposes of this Adversary Proceeding, voidable pursuant to MCA § 31-2-333(1)(a)." *Id.* at 664. The bankruptcy court ruled that the Liquidating Trust established that "none of the Debtors received reasonably equivalent value in exchange for the Release" and that "the Debtors were insolvent upon consummation of the release." *Id.* at 665-67. The bankruptcy court also ruled that the releases were constructively fraudulent transfers pursuant to § 333(1)(b). *Id.* at 668. The bankruptcy court sustained the Liquidating Trust's breach of fiduciary duty claims against plaintiff, ruling that such breaches caused substantial harm to the debtors. *Id.* at 671.

The bankruptcy court then turned to plaintiff's remaining defenses. The court

---

[9]As noted above, the Court recounts the bankruptcy court's findings and rulings, not for the truth of the matters asserted therein, but for the fact that such findings and rulings were made.

rejected plaintiff's argument that, at all times relevant, he was acting on the advice of counsel and should not therefore bear any liability. *Id.* at 671. The court next considered plaintiff's unclean hands and *in pari delicto* defense, namely, "that [plaintiff] is not getting a fair shake because YCLT is controlled by Credit Suisse." *Id.* at 673. The bankruptcy court noted that this defense stemmed from Credit Suisse's involvement in the Third Amended Plan, which it negotiated on behalf of itself and the prepetition lenders, the UCC, and debtors. *Id.* Under the plan, the prepetition lenders released their claims against Credit Suisse. *Id.* at 674. The Third Amended Plan also allowed approximately $229 million for the prepetition lenders' claims to the debtors' assets, to be divided between Class 3 and Class 8 claims. *Id.* at 673-74. The Third Amended Plan provided for the creation of the Liquidating Trust, which would take possession of all property and assets of the debtors. *Id.* at 673. The bankruptcy court noted that, pursuant to the Settlement Term Sheet, Credit Suisse, as the Prepetition Agent, could appoint four of the Liquidating Trust's seven board members and that the Liquidating Trust would appoint Holland & Hart LLP – Credit Suisse's previous legal counsel – as its counsel. *Id.* at 674. The bankruptcy court noted that the largest creditor in the case had been Credit Suisse and the prepetition lenders, with Credit Suisse retaining ownership in 5.5% of the Credit Suisse loan and the prepetition lenders owning the remainder. *Id.* at 674-75 n.57. The bankruptcy court ruled:

> YCLT is only a successor of the Debtors. Blixseth has shown no evidence to suggest any wrong doing by the Debtors. Similarly, YCLT is not a successor in interest to Edra and the Court, to date, has not agreed with Blixseth's grand conspiracy theory regarding Byrne and Edra. Thus, the Court is not convinced that YCLT has unclean hands in this matter. Moreover, while Credit Suisse was permitted to appoint four of the seven

11

members to the Trust Advisory Board, the Court is not convinced that Credit
Suisse controls YCLT.  The Court also agrees with YCLT that no basis exists
whatsoever upon which any misconduct that may have been engaged in by
Credit Suisse should be imputed upon YCLT.

*Id.* at 675 (footnote omitted).  On this point, the bankruptcy court noted:

According to terms of the confirmed Plan, Credit Suisse, as agent for the
Prepetition Lenders, was entitled to appoint four of the seven members of
the Board.  Two of its designees are representatives of independent hedge
funds (Scoggin and Babson) who are Prepetition Lenders that vote in their
own economic interest.  Scoggin has a 5% interest in the loan and Babson
has an 11% interest.  The Prepetition Lenders are the entities, funds and
others who purchased the debt placed by Credit Suisse.  The other two
Credit Suisse designees on the Board are Messrs. Hunt and McGloin, who
are independent businessmen.  The remaining three members represent
other constituencies not aligned with the Prepetition Agent or the Prepetition
Lenders – Yellowstone Club World, LLC, the LeMond Plaintiffs, and the non-
settling Class B shareholders.

*Id.* at 675 n.58.

Although the bankruptcy court ruled that plaintiff's unclean hands and *in pari*

*delicto* defense did not bar the Liquidating Trust's claims, the court turned its attention

to the conduct of Credit Suisse and the prepetition lenders.  The bankruptcy court found

that, in issuing the Credit Suisse loan, Credit Suisse "turn[ed] a blind eye to Debtors'

financial statements," *id.* at 676, and failed to do its due diligence with respect to the

loan, conduct of which the court stated: "The naked greed in this case combined with

Credit Suisse's complete disregard for the Debtors or any other person or entity who

was subordinated to Credit Suisse's first lien position, shocks the conscience of this

Court."  *Id.* at 677.  The bankruptcy court found that Credit Suisse negotiated a "position

that allowed YCLT to step in and seek payment on behalf of Credit Suisse on a

nonrecourse loan.  If Credit Suisse had wanted to go after Blixseth in the event of a

default, it should have included such provision in the Credit Agreement.  This it did not do." *Id.* at 677-78.  As a result, the bankruptcy court precluded Credit Suisse and the prepetition lenders from benefitting from their participation in the Credit Suisse loan and ruled that those two parties would be prohibited from "converting a nonrecourse loan into a recourse loan through crafty legal negotiations with the Debtors and the Committee." *Id.* at 678.  The bankruptcy court held the damage award against plaintiff would not include claims possessed by Credit Suisse and the prepetition lenders.  *Id.*

On September 7, 2010, the bankruptcy court issued an amended judgment against plaintiff and in favor of the Liquidating Trust for $40 million.  *AP-15* (Docket No. 582).  After resolution of plaintiff's motions to disqualify the bankruptcy judge and to dismiss AP-14 for lack of subject matter jurisdiction, the bankruptcy court issued a second amended judgment on December 5, 2012 against plaintiff for $40 million, directing that none of the proceeds from the judgment be paid to Credit Suisse.  *Id.* (Docket No. 713).  Plaintiff subsequently appealed to the district court.  On April 7, 2014, the district court denied plaintiff's appeal.  *In re Yellowstone Mountain Club, LLC*, 2014 WL 1369363, at *1 (D. Mont. April 7, 2014).  Plaintiff appealed the district court's decision to the United States Court of Appeals for the Ninth Circuit.  His appeal remains pending.  *See In re Yellowstone Mountain Club, LLC v. Brian Glasser*, No. 14-35438 (9th Cir.).

### D.  *Kirschner v. Blixseth*

On October 5, 2011, the Liquidating Trust brought suit against plaintiff in the United States District Court for the Central District of California to recover on BGI's

claims. *Kirschner v. Blixseth*, No. 11-cv-08283-GAF-SP (C.D. Cal. October 5, 2011)

(Docket No. 1).  The Liquidating Trust sought to "set aside the release of Blixseth's

liability on the Notes as a fraudulent transfer under 11 U.S.C. § 548(a) and California

Civil Code § 3439.04, and to collect on the Notes under a breach of contract theory."

*Id.* (Docket No. 72 at 5).  Mr. Blixseth filed a motion to dismiss under Fed. R. Civ. P.

12(b)(1) and 12(b)(6), which the court denied.  *Id.* (Docket No. 18 at 13).  Mr. Blixseth

then filed counterclaims for contribution and unjust enrichment against Credit Suisse.

*Id.* (Docket No. 27 at 3-4).  The court noted that the factual allegations underlying the

claims against the Liquidating Trust, which were incorporated into the claims asserted

against Credit Suisse, were "substantially similar" to those asserted by plaintiff in the

present case.  *Id.* (Docket No. 72 at 6).  On November 1, 2012, the court dismissed Mr.

Blixseth's counterclaims against Credit Suisse pursuant to Fed. R. Civ. P. 12(b)(6).  *Id.*

(Docket No. 72 at 2, 36).  On June 18, 2014, the court granted summary judgment in

favor of the Liquidating Trust, giving preclusive effect to the bankruptcy court's ruling in

AP-14 that the releases were a fraudulent transfer.  *Id.* (Docket No. 123 at 9-11).

### E.  Procedural History

On February 14, 2012, plaintiff filed the present case, asserting claims against

Credit Suisse, Cushman, and Dean Pauww for (1) violations of the Racketeer

Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968; (2)

common law fraud; (3) breach of fiduciary duty; (4) common law negligence and

negligent misrepresentation; (5) tortious interference with contractual relations; (6)

breach of covenants of good faith and fair dealing under the Uniform Commercial Code

and common law; (7) breach of contract; (8) equitable indemnity; and (9) common law conspiracy.  Docket No. 1 at 68-83.  Cushman and Mr. Pauww as well as Credit Suisse filed motions to dismiss.  Docket No. 24; Docket No. 28.  On September 30, 2013, the Court dismissed all of plaintiff's claims against Cushman and Mr. Pauww.  Docket No. 61 at 29.  The Court dismissed plaintiff's RICO, fraud, breach of fiduciary duty, negligence and negligent misrepresentation, breach of contract, equitable indemnity, breach of the implied covenant of good faith and fair dealing, and conspiracy claims against Credit Suisse.  *Id.*  The Court granted plaintiff leave to amend with respect to his claim for breach of the implied covenant of good faith and fair dealing against Credit Suisse and allowed plaintiff to proceed with his tortious interference claim against Credit Suisse, *id.*, claims which plaintiff now asserts in the First Amended Complaint and Jury Demand [Docket No. 68].

The parties filed competing motions to reconsider the Court's September 30, 2013 order, which the Court denied.  Docket No. 91.  Credit Suisse filed a motion to dismiss plaintiff's claim for breach of the implied covenant of good faith and fair dealing. Docket No. 73.  The Court dismissed the portion of plaintiff's good faith and fair dealing claim arising from Credit Suisse's actions with respect to appraisals, but denied Credit Suisse's motion to dismiss in all other respects.  Docket No. 90 at 5, 14.  Thus, there are two claims currently before the Court.  Plaintiff's tortious interference with contract claim alleges that Credit Suisse interfered with the releases by causing the Liquidating Trust to assert that the releases were invalid and unenforceable and that Credit Suisse, in negotiating the Settlement Term Sheet, interfered with the MSA by seeking to capture property plaintiff received pursuant to the MSA.  Docket No. 68 at 60, ¶¶ 129-

30. Plaintiff's good faith and fair dealing claim alleges that Credit Suisse's conduct in the Yellowstone Club bankruptcy proceedings was in contravention of the Credit Agreement's no recourse provision. *Id.* at 66-67, ¶ 145.

On January 16, 2015, Credit Suisse filed the present motion. Docket No. 117. Credit Suisse seeks summary judgment on both of plaintiff's remaining claims.

## II. STANDARD OF REVIEW

Summary judgment is warranted under Federal Rule of Civil Procedure 56 when the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248-50 (1986). A disputed fact is "material" if under the relevant substantive law it is essential to proper disposition of the claim. *Wright v. Abbott Labs., Inc*., 259 F.3d 1226, 1231-32 (10th Cir. 2001). Only disputes over material facts can create a genuine issue for trial and preclude summary judgment. *Faustin v. City & Cnty. of Denver*, 423 F.3d 1192, 1198 (10th Cir. 2005). An issue is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party. *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997).

However, "[w]hen, as in this case, the moving party does not bear the ultimate burden of persuasion at trial, it may satisfy its burden at the summary judgment stage by identifying a lack of evidence for the nonmovant on an essential element of the nonmovant's claim." *Bausman v. Interstate Brands Corp.,* 252 F.3d 1111, 1115 (10th Cir. 2001) (quoting *Adler v. Wal-Mart Stores, Inc.,* 144 F.3d 664, 671 (10th Cir. 1998))

16

(internal quotation marks omitted).  "Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter." *Concrete Works of Colo., Inc. v. City & Cnty. of Denver*, 36 F.3d 1513, 1518 (10th Cir. 1994) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986)).  The nonmoving party may not rest solely on the allegations in the pleadings, but instead must designate "specific facts showing that there is a genuine issue for trial."  *Celotex,* 477 U.S. at 324; *see* Fed. R. Civ. P. 56(e).  "To avoid summary judgment, the nonmovant must establish, at a minimum, an inference of the presence of each element essential to the case."  *Bausman,* 252 F.3d at 1115 (citing *Hulsey v. Kmart, Inc.,* 43 F.3d 555, 557 (10th Cir.1994)).  "In applying this standard, we view all facts and any reasonable inferences that might be drawn from them in the light most favorable to the nonmoving party."  *Henderson v. Inter-Chem Coal Co., Inc.*, 41 F.3d 567, 569 (10th Cir. 1994).

## III. ANALYSIS

### A.  Issue Preclusion

Credit Suisse argues that plaintiff's claims are barred by the doctrine of issue preclusion.[10]  Docket No. 117 at 16, 17.  Under the doctrine of issue preclusion, "once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case."  *Allen v. McCurry*, 449 U.S. 90, 94 (1980); *see also Moss v. Kopp*, 559 F.3d 1155, 1161 (10th Cir. 2009) ("Collateral estoppel bars a party from relitigating an

---

[10]The terms "issue preclusion" and "collateral estoppel" are interchangeable. *See Sil-Flo, Inc. v. SFHC, Inc.*, 917 F.2d 1507, 1520 (10th Cir. 1990).

issue once it has suffered an adverse determination on the issue, even if the issue arises when the party is pursuing or defending against a different claim.").[11]  To invoke issue preclusion, however, "mutuality of parties is not necessary.  Instead, this doctrine requires an identity of issues raised in the successive proceedings and the determination of these issue by a valid final judgment to which such determination was essential."  *Sil-Flo*, 917 F.2d at 1520; *see also Ruyle v. Continental Oil Co.*, 44 F.3d 837, 846 (10th Cir. 1994) ("the pendency of an appeal does not prevent application of the collateral estoppel doctrine unless the appeal involves a full trial de novo.").  A party asserting the defense of issue preclusion must establish four elements:

> (1) the issue previously decided is identical with the one presented in the action in question, (2) the prior action has been finally adjudicated on the merits, (3) the party against whom the doctrine is invoked was a party or in privity with a party to the prior adjudication, and (4) the party against whom the doctrine is raised had a full and fair opportunity to litigate the issue in the

---

[11]Neither party addresses whether federal or state law applies to Credit Suisse's assertion of issue preclusion.  The Tenth Circuit has suggested that "'[f]ederal law determines the effects under the rule of res judicata of a judgment of a federal court.'"  *Murdock v. Ute Indian Tribe of Uintah & Ouray Reservation*, 975 F.2d 683, 687 (10th Cir. 1992) (quoting Restatement (Second of Judgments § 87, at 314 (1982)); *cf. Kinslow v. Ratzlaff*, 158 F.3d 1104, 1105 (10th Cir. 1998) ("A party's ability to relitigate an issue decided in a prior state court determination depends on the law of the state in which the earlier litigation occurred.").  Other circuits confronted with the question have ruled that federal law determines the preclusive effect of a bankruptcy court's rulings. *In re Kane*, 254 F.3d 325, 328 (1st Cir. 2001).  However, additional complications may arise where a federal court's judgment relies in substantial part on state substantive law.  *See* 18B Charles Alan Wright et al., *Federal Practice & Procedure* §§ 4468, 4472 (2d ed. 2015).  Here, the bankruptcy court asserted jurisdiction over the parties' claims in AP-14 pursuant to 28 U.S.C. § 1334, but the parties' claims turned in large part on Montana law.  *See AP-14* (Docket No. 257-1 at 7); *Id.*, 436 B.R. at 661.  The parties cite only federal law and therefore appear to presume that federal law should determine the preclusive effect of the bankruptcy court's ruling in AP-14.  *See* Docket No. 117 at 11-12; Docket No. 123 at 10.  In light of the parties' positions on the issue and the foregoing authority, the Court will apply federal law in considering Credit Suisse's assertion of issue preclusion.

prior action.

*Moss*, 559 F.3d at 1161.

### 1. Control of the Liquidating Trust

Credit Suisse argues that preclusive effect should be given to the bankruptcy court's ruling that Credit Suisse did not control the Liquidating Trust, thereby barring plaintiff's claims in the present case.   Credit Suisse asserts that plaintiff's claims seek to hold it liable, not for any direct action it took against plaintiff, but for its actions in inducing the Liquidating Trust to pursue claims against plaintiff to invalidate the releases and recover loan proceeds.   Docket No. 117 at 14, 17.   Credit Suisse therefore argues that, if preclusive effect is given to the bankruptcy court's finding that Credit Suisse did not control the Liquidating Trust, then the fact that it did not control the Liquidating Trust is a complete defense to both plaintiff's claims.   Docket No. 117 at 16-17.   In response, plaintiff attempts to shift the focus of his claims to Credit Suisse's conduct prior to the creation of the Liquidating Trust.   Plaintiff argues that, because Credit Suisse, not the Liquidating Trust, was among the parties that created the Settlement Term Sheet and the Third Amended Plan, the bankruptcy court's ruling on the issue of control is not material to his tortious interference claim.   Docket No. 123 at 15.   Similarly, plaintiff argues that, prior to the formation of the Liquidating Trust, Credit Suisse's "decision to treat the loan as wholly unsecured and jointly modify the Plan" constitutes a breach of the duty of good faith and fair dealing.   *Id.* at 16.   Thus, plaintiff initially appears to take the position that, solely by its participation in negotiating, drafting, and supporting the Settlement Term Sheet and Third Amended Plan, Credit Suisse wrongfully set in motion a chain of events that would lead the Liquidating Trust

19

to bring claims against plaintiff seeking to invalidate the releases and to recover loan proceeds. This suggests that perhaps Credit Suisse's control over the Liquidating Trust is not dispositive of plaintiff's claims. But plaintiff does not stop there. He next argues that

> the continued pursuit of Blixseth by the YCLT is a continual breach of the covenant [of good faith and fair dealing]. For example, if CS [i.e. Credit Suisse] wanted to cease violating the covenant it could reach a settlement with Blixseth. CS, through its prepetition lenders have a majority of the votes necessary to approve settlement. . . . CS could stop seeking repayment from Blixseth at any time. It has not elected to force the YCLT to settle or agree to settle the various lawsuits the YCLT is bringing against Blixseth.

Docket No. 123 at 19-20.[12] This argument undercuts plaintiff's contention that the issue of control is not material to his claims and instead indicates that plaintiff seeks to hold Credit Suisse liable precisely because of its ability to control the Liquidating Trust. In light of plaintiff's arguments and the allegations in plaintiff's amended complaint, plaintiff's claims focus on two time periods: (1) Credit Suisse's negotiation of the Settlement Term Sheet and the Third Amended Plan prior to the formation of the Liquidating Trust and (2) Credit Suisse's exercise of control over the Liquidating Trust after the trust's formation. *See* Docket No. 68 at 59-60, ¶¶ 126, 130; *id.* at 66-67, ¶ 145. The question therefore becomes whether the bankruptcy court's ruling on the issue of control is dispositive as to the claims regarding the second time period.

Plaintiff disputes only the first element of Credit Suisse's issue preclusion defense. Determining whether the issue actually litigated and determined in a prior

_____

[12]Plaintiff also seeks discovery regarding, among other things, Credit Suisse's selection and continued oversight of Liquidating Trust board members. Docket No. 123-26 at 2, ¶ 12.

proceeding is identical to the issue presented in a current case is a fact specific inquiry.

*Arizona v. California*, 530 U.S. 392, 414 (2000) (quotation omitted).  The Tenth Circuit

has noted that relevant considerations may include:

> Is there a substantial overlap between the evidence or argument to be
> advanced in the second proceeding and that advanced in the first?  Does the
> new evidence or argument involve application of the same rule of law as that
> involved in the prior proceeding?  Could pretrial preparation and discovery
> relating to the matter presented in the first action reasonably be expected to
> have embraced the matter sought to be presented in the second?  How
> closely related are the claims involved in the two proceedings?

*B-S Steel of Kan., Inc. v. Tex. Indus., Inc.*, 439 F.3d 653, 663 (10th Cir. 2006) (quoting

Restatement (Second) of Judgments § 27 cmt. c.).  An issue is actually litigated and

decided if it is "properly raised, by the pleadings or otherwise, and is submitted for

determination, and is determined."  Restatement (Second) of Judgments § 27, cmt. d.

However, even if an issue is actually decided in the prior proceeding, preclusive effect

does not attach unless the resolution of the issue was "essential to the judgment" in the

prior proceeding.  *Arizona*, 530 U.S. at 414.

The amended final pretrial order in AP-14 states that plaintiff sought a

declaratory judgment that Credit Suisse – not the Liquidating Trust – was the real party

in interest with respect to the Liquidating Trust's claims.  *AP-14* (Docket No. 538 at 4).

Plaintiff asserted substantially the same argument as a defense to the Liquidating

Trust's claims, namely that the trust lacked standing "because it is controlled by a party[

– Credit Suisse – ]who participated in the allegedly bad behavior."  *Id.* (Docket No. 538

at 4, 26).  This argument was listed in the amended final pretrial order as a legal issue

to be argued at trial.  Thus, Credit Suisse's ability to control the Liquidating Trust was

squarely raised in the pleadings and submitted to the bankruptcy court for

21

determination, just as it is raised in the pleadings in the present case. *Cf.* Docket No. 68 at 59, ¶ 126.

In his post-trial brief, filed after trial but the before the bankruptcy court issued a ruling on the merits, plaintiff argued that Credit Suisse exercises control over the Liquidating Trust because Credit Suisse can appoint a majority of members to the Liquidating Trust board, hand picked Mr. Kirschner as the trustee, and dictated that Credit Suisse's former counsel represent the Liquidating Trust. *AP-14* (Docket No. 571 at 41-44). Plaintiff, citing the deposition testimony of a Liquidating Trust board member, argued that the people Credit Suisse appointed to the board voted as a bloc to control the trust and would not approve a settlement that does not benefit Credit Suisse. *Id.* (Docket No. 571 at 45). Plaintiff further contended that Credit Suisse and the prepetition lenders had the most to gain from a recovery against plaintiff. *Id.* (Docket No. 571 at 46). Plaintiff concluded his arguments on the issue by asserting that Credit Suisse could not seek recovery from him and that, given Credit Suisse's control over the Liquidating Trust, the Liquidating Trust was similarly prohibited. *Id.* (Docket No. 571 at 47). Plaintiff's arguments on the issue of control in the present case are based upon the same assertions. *Cf.* Docket No. 123 at 8-9, ¶ 58; *see also B-S Steel*, 439 F.3d at 663.

After presiding over nine total days of trial and considering the parties' arguments, the bankruptcy court ruled on plaintiff's control/unclean hands defense. *AP-14*, 436 B.R. at 675. After reviewing the Settlement Term Sheet as it related to Credit Suisse's right to appoint board members and as it related to the appointment of Credit

Suisse's former counsel, the bankruptcy court ruled that, although Credit Suisse was permitted to appoint a majority of the Liquidating Trust board members, plaintiff did not establish that Credit Suisse controls YCLT and further found no basis to impute Credit Suisse's improper conduct on the Liquidating Trust. *Id.* at 674-75.  In so ruling, the bankruptcy court noted that Credit Suisse's designees to the board consisted of two representatives of independent hedge funds who "vote in their own economic interest" and two "independent businessmen" and that the remaining members "represent other constituencies not allied with the Prepetition agent or the Prepetition Lenders."  *Id.* at 675 n.58.  To the extent plaintiff argues that the bankruptcy court's ruling was somehow unclear on this issue, plaintiff's argument is without merit.  *See* Docket No. 123 at 15. The bankruptcy court considered and ruled against plaintiff with respect to his claim that Credit Suisse controlled the Liquidating Trust.

Plaintiff's primary argument appears to be, not that the issue of Credit Suisse's control over the Liquidating Trust in this proceeding is somehow different from the issue raised and decided in AP-14, but that the bankruptcy court's decision in AP-14 "did not hinge on the issue of whether CS controlled the YCLT."  Docket No. 123 at 14.  "A determination ranks as necessary or essential only when the final outcome hinges on it."  *Bobby v. Bies*, 556 U.S. 825, 835 (2009); *see also In re Microsoft Corp. Antitrust Litig.*, 355 F.3d 322, 327 (4th Cir. 2004) ("in describing the scope of the 'critical and necessary' criterion, we have used the alternative word 'essential'").  The bankruptcy court sustained plaintiff's unclean hands and *in pari delicto* defense as to Credit Suisse and the prepetition lenders.  *AP-14*, 436 B.R. at 678 ("the Court will not at this time

enter an order that would in any way benefit Credit Suisse, the Prepetition Lenders or other parties who have speculated on a monumental award against Blixseth"). As a result, the court ruled that any amounts recovered from plaintiff would not be distributed to Credit Suisse and the prepetition lenders. *Id.* Given that the bankruptcy court found that Credit Suisse did not control the Liquidating Trust and that Credit Suisse's misconduct could not be imputed to the Liquidating Trust, Credit Suisse would have otherwise been able to recover against plaintiff but for the bankruptcy court's determination that Credit Suisse had unclean hands. The bankruptcy court's ruling that Credit Suisse did not control the liquidating trust was a necessary step in the bankruptcy court's analysis before it was appropriate to address plaintiff's unclean hands defense and the court's ultimate ruling that the Liquidating Trust – but not Credit Suisse – could benefit from any damages recovered from plaintiff.[13] *See Murdock*, 975 F.2d at 688 ("To reach this conclusion, the Supreme Court also had to conclude that the assignment of the indivisible assets to the UDC was proper, for if it were improper, the UDC would have no rights with regard to the indivisible tribal assets, and the stock it issued would have been worthless."); *Sack v. St. Francis Hosp.*, 1993 WL 55955, at *2 (10th Cir. March 1, 1993) (unpublished) ("the district court's finding in the prior action that Mr. Sack's blood was taken *after* he was arrested was necessary to the court's ultimate holding that the Defendant officer had not violated Mr. Sack's clearly

---

[13]Moreover, but for the bankruptcy court's finding that Credit Suisse did not control the Liquidating Trust, the bankruptcy court would have had to resolve the question of whether the Liquidating Trust's recovery should be limited because of Credit Suisse's misconduct. The bankruptcy court did not explicitly or impliedly reach such an issue, further supporting the conclusion that the court's finding regarding Credit Suisse's control over the Liquidating Trust was necessary to the judgment in AP-14.

established statutory or Constitutional rights and was therefore entitled to qualified immunity").

The Court finds that the identity of issues element is satisfied with respect to the bankruptcy court's ruling that Credit Suisse did not control the Liquidating Trust.  There is no dispute as to the remaining elements.  Thus, the Court will give preclusive effect to the bankruptcy court's ruling on this issue.  Once the Liquidating Trust was formed, it assumed the debtors' claims against plaintiff.  Because the Liquidating Trust was the entity that controlled the prosecution of those claims and ultimately succeeded in setting aside the releases and obtaining a judgment against plaintiff for the Credit Suisse loan proceeds, plaintiff's claims in this case – to the extent they are based on actions Credit Suisse took after the Liquidating Trust was formed – are premised on Credit Suisse's ability to manipulate the Liquidating Trust into securing those outcomes. Therefore, the fact that Credit Suisse did not control the Liquidating Trust bars any aspect of plaintiff's claims that is based upon actions Credit Suisse took after formation of the Liquidating Trust.  *See Matosantos Commercial Corp. v. Applebee's Int'l, Inc.*, 245 F.3d 1203, 1209 (10th Cir. 2001) ("All the claims pleaded in Matosantos' Kansas complaint are based on the underlying issue decided in the Puerto Rico District court: 'whether [Applebee's] assumed or promised to assume Casual Dining's obligation to pay for the Matosantos inventory.'").  Those aspects of plaintiff's claims are therefore dismissed.  *See Robinson v. Volkswagenwerk AG*, 56 F.3d 1268, 1273 (10th Cir. 1995) (holding that jury in prior action necessarily found at least one of multiple facts, any one of which "is incompatible with the damages for fraud claimed by plaintiffs in this action").

25

### B.  Credit Suisse's Conduct Prior to the Formation of the Liquidating Trust

The Court turns to the remaining aspect of plaintiff's claims, which concerns Credit Suisse's conduct prior to the formation of the Liquidating Trust.

### 1.  Tortious Interference with Contract

Plaintiff generally alleges that Credit Suisse engaged in conduct that "caused the Liquidating Trustee to assert that the releases were invalid and not enforceable, thus depriving Plaintiff of an extremely valuable contract right," which arguably implicates Credit Suisse's conduct prior to formation of the Liquidating Trust.  Docket No. 68 at 60, ¶ 129; *see also id.* at 61, ¶ 133.  Plaintiff alleges that Credit Suisse, Cross Harbor, the UCC, and the debtors drafted and executed the Settlement Term Sheet which made plaintiff the sole target for funding a bankruptcy plan, "which involved the capturing of virtually all of Plaintiff's marital community that he had received out of the MSA."  *Id.* at 60, ¶ 130.  Plaintiff asserts that the Settlement Term Sheet was adopted and incorporated into the Third Amended Plan "and as a result, litigation was commenced against Plaintiff in AP-14 and other litigation for the purpose of recovering from plaintiff (as the sole source) monies for the payment of the Club's unsecured creditors."  *Id.*  It was in this manner that Credit Suisse allegedly interfered with the releases and the property division provisions of the MSA.  *Id.* at 60, ¶ 131.  As plaintiff's allegations concede, *see* Docket No. 68 at 60, ¶ 129, this claim is dependent upon a causal relationship between Credit Suisse's actions prior to formation of the Liquidating Trust and the judgments against plaintiff setting aside the releases and for the loan proceeds.

Credit Suisse argues that, because it did not directly control the Liquidating Trust, no such causal relationship exists.  Docket No. 117 at 16; Docket No. 129 at 5 n.5.  In response, plaintiff fails to identify, with citation to the record, specific evidence supporting his contention that Credit Suisse caused any interference with the releases of the MSA.  *See Adler*, 144 F.3d at 671.  Plaintiff asserts that the Settlement Term Sheet made plaintiff the sole target of the Yellowstone Club bankruptcy, implying that, absent Credit Suisse's conduct, the UCC and the Liquidating Trust would have sought to recover funds from other individuals.  However, plaintiff does not identify any such persons or entities.  Moreover, the portions of the Settlement Term Sheet upon which plaintiff relies in support of his position do not, without more, support the conclusion that the plaintiff was to become the lone focus of the Yellowstone Club bankruptcy at the exclusion other appropriate individuals.  *See* Docket No. 123 at 8, ¶ 57 (citing Docket No. 123-21 at 4, § 3.c; *id.* at 9-10, § 5.c, g; *id.* at 12, § 9.[14]  Although the Settlement Term Sheet provides for the settlement of the UCC's and debtors' claims against Credit Suisse and provides that the Liquidating Trust would acquire the right to enforce the BGI notes, these facts do not, by themselves, give rise to the inference that the Settlement Term Sheet set in motion a course of conduct that was substantially certain to culminate in the claimed interference with the releases and the MSA.

Plaintiff also asserts that Credit Suisse is culpable for its involvement in drafting

---

[14]As Credit Suisse correctly points out, plaintiff's argument is also factually incorrect.  On February 4, 2009, the UCC brought suit against Ms. Blixseth and BGI, a suit which the parties voluntarily dismissed after Ms. Blixseth and BGI entered bankruptcy.  *Kirschner v. BLX Grp., Inc.*, No. 09-00010 (Bankr. D. Mont. Jan 14, 2010) (Docket No. 72).

and voting for the Third Amended Plan. Docket No. 123 at 9, ¶ 59. Plaintiff contends that the Third Amended Plan provided for the dismissal of all claims against Credit Suisse, but that plaintiff was not afforded the same benefit. Docket No. 123-23 at 49, § 8.4; *id.* at 52, §§ 9.2.4, 9.2.5. Plaintiff's argument implies that he and Credit Suisse were somehow equally situated such that, if claims against Credit Suisse were dismissed, claims against him should be dismissed as well – an implication which plaintiff does not support. Plaintiff also points out that the Third Amended Plan provided for the transfer to the Liquidating Trust of certain actions against third parties, a fact which, by itself, does not establish causation. *See id.* at 48, § 8.2.2; *see also id.* at 21-22, § 1.111, § 1.117.

Plaintiff's theory of liability relies on the presumption that, but for Credit Suisse's allegedly tortious actions in negotiating, drafting, and supporting the Settlement Term Sheet and the Third Amended Plan, no one – not the debtors, not the UCC, not any other entity – would have brought or continued to prosecute suits against plaintiff to set aside the releases as fraudulent transfers and to recover from him personally. Not only does plaintiff fail to provide evidentiary support for such a presumption, it is a presumption which is contradicted by the record. First, prior to the formation of the Liquidating Trust, the execution of the Settlement Term Sheet, and the confirmation of the Third Amended Plan, the UCC brought claims against plaintiff seeking to set aside the transfer of loan proceeds to plaintiff as a fraudulent transfer. *AP-14* (Docket No. 257-1 at 6). Plaintiff does not directly claim that Credit Suisse influenced the UCC's decision to assert such claims and there is no basis to conclude that, absent Credit Suisse's involvement, the UCC or its successor in interest would have abandoned

28

them.  Second, plaintiff admits that he personally received approximately $199 million in Credit Suisse loan proceeds, ostensibly as a loan, from BGI.  *See* Docket No. 117 at 5, ¶¶ 6-7.  Although the no recourse provision may have prevented Credit Suisse from recovering those proceeds, the UCC and the debtors were not similarly bound.  There is no evidence suggesting that, but for Credit Suisse's involvement, no attempt would have been made to set aside the releases in an effort to recover the considerable sum of money plaintiff received from the debtors.  In other words, plaintiff fails to establish that the interference of which he complains was caused by Credit Suisse's actions during the relevant time period.  *See Emmerson v. Walker*, 236 P.3d 598, 603 (Mont. 2010) (holding that tortious interference claim requires plaintiff to establish that tortious acts were "done with the unlawful purpose of causing damage or loss" and "that actual damages and loss resulted" (quotations omitted)).  Credit Suisse is therefore entitled to summary judgment on the remaining aspect of plaintiff's tortious interference claim.

## 2.  Breach of the Duty of Good Faith and Fair Dealing

Plaintiff claims that, by virtue of Credit Suisse's involvement in the Yellowstone Club bankruptcy, he was deprived of the benefit and expectation conferred upon him by the no recourse provision.  Docket No. 68 at 66, ¶ 145.[15]  The duty of good faith and fair dealing requires "that the parties perform in good faith the obligations imposed by their agreement."  *Wells Fargo Realty Advisors Funding, Inc. v. Uioli, Inc.*, 872 P.2d 1359, 1363 (Colo. App. 1994).  "The conduct required by the implied covenant of good faith

---

[15]In a previous order, the Court dismissed plaintiff's good faith and faith dealing claim arising out of Credit Suisse's actions with respect to appraisals conducted pursuant to the Credit Agreement.  Docket No. 90 at 5.

and fair dealing is honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade." Mont. Code Ann. § 28-1-211. "A breach of the covenant constitutes a breach of the contract," *Hardy v. Vision Serv. Plan*, 120 P.3d 402, 389 (Mont. 2005), and, absent special circumstances, tort-type damages are not available. *See Story v. City of Bozeman*, 791 P.2d 767, 776 (Mont. 1990), *overruled on other grounds by Arrowhead Sch. Dist. No. 75, Park Cnty v. Klyap*, 79 P.3d 250, 264 (Mont. 2003). Thus, the measure of damages for such a claim is the amount that will compensate the aggrieved party for the damages proximately caused by the breach of the covenant. *Id.* "Damages which are not clearly ascertainable in both their nature and origin cannot be recovered for a breach of contract." Mont. Code. Ann. § 27-1-311.

Plaintiff asserts that Credit Suisse violated reasonable commercial standards by foregoing its right to be repaid through foreclosure on its security interests. Docket No. 123 at 16. Plaintiff contends that Credit Suisse, rather than foreclosing, decided to join the Third Amended Plan and treat its claim as unsecured, knowing with substantial certainty that any recovery would be accomplished by collection from plaintiff personally in contravention of the no recourse provision. *Id.* In response, Credit Suisse argues that, because the borrowers filed for bankruptcy, an automatic stay was imposed prohibiting it from foreclosing on the collateral. Docket No. 117 at 17. Credit Suisse contends that, because the bankruptcy court ruled that Credit Suisse's and the prepetition lenders' interests were adequately protected by the collateral, Credit Suisse could not have obtained relief from the stay to foreclose on the collateral. Docket No. 117 at 18 (citing *In re Buckner*, 66 F.3d 263, 265 (10th Cir. 1995) ("The relief from stay

provision permits the bankruptcy court, after notice and a hearing, to lift the automatic stay 'for cause, including the lack of adequate protection of an interest in property of such party in interest.'" (quoting 11 U.S.C. § 362(d)(1))); *see also YMC Bankr.* (Docket No. 181 at 33).  Plaintiff does not dispute that the bankruptcy court's ruling prevented Credit Suisse from obtaining relief from the automatic stay to foreclose on the collateral. Rather, plaintiff asserts, without citation to any evidence, that Credit Suisse "could have not voted for any plan and allowed the YMC bankruptcy to convert to chapter 7. Instead, the facts show that CS voted for the Settlement Term Sheet to avoid the Partial & Interim Order," Docket No. 123 at 16-17, which, at the time, subordinated Credit Suisse's claims in the Yellowstone Club bankruptcy pursuant to 11 U.S.C. § 510(c). *AP-14* (Docket No. 289 at 20).  Plaintiff's argument is speculative at best.  Plaintiff does not cite any authority in support of his argument that it would have been possible, let alone more commercially reasonable, for Credit Suisse to recover on its claims in a Chapter 7 proceeding.  There is no evidence that Credit Suisse could have unilaterally induced all of the relevant parties and the bankruptcy court to convert the Yellowstone Club bankruptcy into a Chapter 7 proceeding.  Plaintiff does not identify any other means by which Credit Suisse could have been repaid, or that such means would be more commercially reasonable than the path that Credit Suisse ultimately chose.[16]  As a result, plaintiff therefore fails to create a genuine issue of material fact as to the reasonableness of Credit Suisse's actions in supporting the Third Amended Plan and electing not to foreclose on the collateral.

---

[16]Plaintiff does not seek additional discovery on the question of what, if any, additional alternative means Credit Suisse could have used to secure repayment.

31

Plaintiff attempts to broaden his claim by vaguely asserting that Credit Suisse engaged in various acts of subterfuge and bad faith and should not therefore be allowed to rely on the bankruptcy process to "justify the creation of a scheme that made a non-recourse loan, recourse." Docket No. 123 at 17-18. Plaintiff, however, makes no attempt to support his argument with citation to the record. Moreover, such an argument finds no support in plaintiff's amended complaint. Plaintiff alleges only that, during the relevant time period, Credit Suisse breached its duty of good faith and fair dealing by failing "to foreclose on its security as a secured creditor," failing "to seek repayment of the loan from the collateral pledged by Borrower," and "electing not to foreclose on its security as a secured creditor and choosing to pursue Plaintiff for the loan default." Docket No. 68 at 67.[17] Plaintiff therefore fails to support his claim that Credit Suisse failed to observe reasonable commercial standards by choosing to treat the loan as unsecured and voting in favor of the Third Amended Plan.

Even assuming that plaintiff could establish that Credit Suisse failed to observe reasonable commercial standards in negotiating, drafting, and supporting the Settlement Term Sheet and the Third Amended Plan, plaintiff fails to show that any damages were proximately caused by such conduct. *See Story*, 791 P.2d at 776. First, plaintiff does not precisely identify what damages he suffered. Although judgment was entered against plaintiff in AP-14, it is not clear that he has satisfied that judgment and, even if he had, the judgment would not inure to Credit Suisse's benefit. Plaintiff's

_____

[17]As discussed above, plaintiff's allegations that Credit Suisse breached the covenant by participating in lawsuits against plaintiff are precluded by the bankruptcy court's decision.

amended complaint alleges only that he was "damaged financially," Docket No. 68 at 68, ¶¶ 146-47,[18] and, with respect to his other claim, that he suffered damage to his business reputation as well as attorneys' fees and costs from litigation resulting out of the Yellowstone Club bankruptcy.  *See* Docket No. 68 at 62, ¶ 135.  Second, assuming that plaintiff suffered damages, plaintiff does not provide any evidence that Credit Suisse's wrongful conduct during the relevant time period caused them.  The UCC brought a claim seeking recovery of Credit Suisse's loan proceeds prior to execution of the Settlement Term Sheet, and there is no reason to think it would have simply abandoned any efforts to recover those funds had Credit Suisse not been involved in the creation of the Settlement Term Sheet and Third Amended Plan.  Moreover, the UCC, debtors, and the Liquidating Trust were the parties who prosecuted the litigation seeking to recover the loan proceeds, and plaintiff does not establish that any of those entities were instrumentalities of Credit Suisse or that they would have acted differently absent Credit Suisse's involvement.  Thus, plaintiff has failed to establish that his claimed damages were caused by Credit Suisse's allegedly wrongful conduct prior to the formation of the Liquidating Trust.  The remaining aspect of plaintiff's breach of good faith and fair dealing claim is therefore dismissed.

---

[18]Although plaintiff seeks "exemplary damages," *id.*, "tort damages are not available for breach of the implied covenant of good faith and fair dealing in common contract actions."  *Keller v. Dooling*, 813 P.2d 437, 541 (Mont. 1991).

## C. Rule 56(d)[19]

Plaintiff argues that, pursuant to Fed. R. Civ. P. 56(d), Credit Suisse's motion for

summary judgment should be denied or deferred to allow him to conduct discovery.

Docket No. 123 at 19.[20]  A party may seek limited discovery under Rule 56(d) of the

Federal Rules of Civil Procedure in order to respond to a summary judgment motion.

Rule 56(d) allows a court to stay or deny a summary judgment motion in order to permit

further discovery if the nonmovant states by affidavit that it lacks facts necessary to

oppose the motion.  *Price ex rel. Price v. W. Res., Inc.*, 232 F.3d 779, 783 (10th Cir.

2000).  In order to be afforded relief, plaintiff must show (1) that necessary probable

facts are not available, (2) why those facts cannot be presented currently, (3) "what

steps have been taken to obtain these facts," and (4) "how additional time will enable

[plaintiff] to" obtain those facts and rebut the motion for summary judgment.  *Comm. for*

*First Amendment v. Campbell*, 962 F.2d 1517, 1522 (10th Cir. 1992); *see also Price*,

232 F.3d at 783 ("Rule 56(f) does not operate automatically.  Its protections . . . can be

---

[19] Effective December 1, 2010, the Supreme Court amended Rule 56, and what is now Rule 56(d) previously was codified as Rule 56(f).  Fed. R. Civ. P. 56 Adv. Comm. Note (2010) ("The standard for granting summary judgment remains unchanged . . . Subdivision (d) carries forward without substantial change the provisions of former subdivision (f)").

[20] To the extent plaintiff argues that, as a general matter, summary judgment is premature until all parties have conducted discovery, plaintiff misstates the relevant standard.  "There is no requirement in [Rule 56] that summary judgment not be entered until discovery is complete."  *Weir v. Anaconda Co.*, 773 F.2d 1073, 1081 (10th Cir. 1985); *accord Hackworth v. Progressive Cas. Ins. Co.*, 468 F.3d 722, 733 n.7 (10th Cir. 2006).  "Any potential problem with . . . premature motions can be adequately dealt with under Rule [56(d)]."  *Celotex*, 477 U.S. at 326.  A party seeking to defer ruling on summary judgment must therefore satisfy the requirements of Rule 56(d), and, upon doing so, is entitled to a full opportunity to conduct discovery.  *See Convertino v. United States Dep't of Justice.*, 684 F.3d 93, 99 (D.C. Cir. 2012).

applied only if a party satisfies certain requirements."). To prevail on a Rule 56(d)

motion, a party must specify with particularity legitimate needs for further discovery and

identify which aspects of discovery require more time to complete. *Jones v. City &*

*Cnty. of Denver*, 854 F.2d 1206, 1211 (10th Cir. 1988). The plaintiff must also allege

why the information sought would be sufficient to create a genuine issue of material fact

to defeat summary judgment. *Campbell*, 962 F.2d at 1522. Denial of a Rule 56(d)

motion is proper if the additional evidence sought would not create a genuine issue of

material fact to defeat summary judgment.

To the extent plaintiff seeks discovery regarding Credit Suisse's alleged control

of the Liquidating Trust, plaintiff's request for Rule 56(d) relief is denied. For the

reasons discussed above, plaintiff is precluded from relitigating this issue. Plaintiff does

not argue, and nothing in plaintiff's counsel's affidavit suggests, that the Court lacks

sufficient facts to rule on Credit Suisse's issue preclusion argument. None of the facts

mentioned in plaintiff's affidavit has any apparent relevance to issue preclusion

elements. Thus, plaintiff's request to defer ruling on Credit Suisse's issue preclusion

argument is denied. *See* Docket No. 123-26 at 2-3, ¶ 12.a, c, d.

The Court turns to plaintiff's request for additional discovery on the question of

whether Credit Suisse's

> actions in executing/assisting in the creation of the Settlement Term Sheet
> and joining/voting for the Third Amended plan [were] not commercially
> reasonable, including all aspects of CS Defendants' business decision to join
> the Third Amended Plan, including all interactions with its bondholders and
> parties to the Settlement Term Sheet, plus an inquiry by experts into CS's
> general business and banking decisions of a typical bank with adequately
> protected collateral.

Docket No. 123-26 at 3, ¶ 12.b. Plaintiff's counsel's affidavit does not contain the

requisite particularity.  Although plaintiff's counsel lists multiple facts that it intends to

seek through discovery, the standard requires plaintiff to show that necessary probable

facts are not available and why such facts cannot be presented.  *See Campbell*, 962

F.2d at 1522.  Although discovery has not commenced in the present case, this fact is

not, by itself, a sufficient basis to grant plaintiff's request.  First, plaintiff is not painting

on a blank canvas.  It is Credit Suisse's alleged misuse of the bankruptcy proceedings

that gives rise to plaintiff's claims, and plaintiff was a litigant in many of those

proceedings.  In AP-14, the bankruptcy court ordered Credit Suisse to provide plaintiff

with a compact disc, in searchable format, of all discovery it previously produced in that

case.  *AP-14* (Docket No. 467 at 3-4).  Plaintiff's post-trial brief relied on trial testimony,

trial exhibits, and cited additional deposition testimony, including the testimony of a

Liquidating Trust board member.  *See, e.g.*, *AP-14* (Docket No. 571 at 42-45 (citing

deposition of Yoav Rubenstein)).  Plaintiff does not argue that facts gathered in other

proceedings are irrelevant and does not explain why he cannot present such facts in

this case.  Second, plaintiff's theory is that Credit Suisse, through the negotiation and

drafting of the Settlement Term Sheet and the Third Amended Plan, influenced the

UCC, the debtors, the Liquidating Trust, and other third parties involved in the

Yellowstone Club bankruptcy to take certain actions against plaintiff.  Plaintiff does not

negate the possibility that third parties may have the facts necessary to respond to the

present motion or the possibility that he and Credit Suisse have equal access to such

facts.  *See Campbell*, 962 F.2d at 1523 ("The affidavits ultimately produced concern

evidence to which both parties conceivably had access.").  Third, plaintiff does not

identify what efforts he has made up to this point to obtain the necessary facts and

makes only a general prediction about how he would acquire such facts in the future. Fourth, plaintiff's theory on the issue of commercial reasonableness is premised on the unsupported assertion that Credit Suisse could have foreclosed on the collateral and/or induced third parties to convert the Yellowstone Club bankruptcy to a Chapter 7 proceeding.  However, plaintiff does not explain why the facts he seeks would be sufficient to establish this assertion and, absent such an explanation, the Court is not convinced that the information sought would be sufficient to create a genuine issue of material fact.  *See Campbell*, 962 F.2d at 1522.  Because plaintiff fails to identify, with particularity, legitimate needs for further discovery and fails to account for any facts that are already in his possession, plaintiff's request for relief pursuant to Rule 56(d) is denied.[21]

## IV.  CONCLUSION

For the foregoing reasons, it is

**ORDERED** that Credit Suisse's Motion for Summary Judgment [Docket No. 117] is **GRANTED**.  It is further

**ORDERED** that this case is dismissed in its entirety.

─────────────────────

[21]Even if the Court were to defer ruling on the question of whether Credit Suisse's pre-plan conduct was commercially reasonable, as discussed above, plaintiff's claims fail for an additional, independent reason, namely, lack of causation.  Plaintiff does not specifically purport to seek discovery on the causal relationship between such conduct and his claimed damages.  Plaintiff was a litigant in the suits that were allegedly the end result of Credit Suisse's actions, and would therefore appear to possess facts relevant to the prosecution and defense of such suits.  Plaintiff does not, however, offer such facts in support of his causation theory or argue that he does not possess them.  Thus, even if the Court were to defer ruling on the commercial reasonableness of Credit Suisse's actions, plaintiff fails to create, or argue that he cannot create, a genuine dispute of material fact as to whether Credit Suisse's conduct caused his claimed damages.

DATED September 4, 2015.

BY THE COURT:


  s/Philip A. Brimmer
PHILIP A. BRIMMER
United States District Judge
United States District Judge